Vera KORABLINA, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 97–70361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 3, 1998.

Decided Oct. 23, 1998.

---

Joseph J. Rose, Los Angeles, CA, for petitioner.

Francis W. Fraser (argued), and Anthony Wray Norwood (on the briefs), United States Department of Justice, Washington, DC, for respondent.

Before: O'SCANNLAIN, TROTT, and FERNANDEZ, Circuit Judges.

TROTT, Circuit Judge:

Vera Korablina, a fifty-five year old native of Russia and a citizen of the Ukraine, witnessed, and was the subject of repeated beatings and severe harassment by an ultra-nationalist group in Kiev. She was the target of this oppression on account of her Jewish heritage.

Korablina petitions this court for review of a Board of Immigration Appeals (BIA) decision dismissing her appeal of an immigration judge's (IJ) denial of her application for asylum and withholding of deportation. Although finding her testimony and the testimony of her daughter to be credible in all respects, the IJ determined that Korablina had established that she was the target only of discrimination, not of persecution. The BIA reviewed the proceedings and affirmed. The BIA held that Korablina had failed to establish either past persecution or a well-founded fear of future persecution on account of being Jewish.

We have jurisdiction under 8 U.S.C. § 1105a, and we grant the petition for review. We hold that the credible evidence compels both a finding of past persecution and a well-founded fear of future persecution. The record also compels a finding that there is a clear probability of persecution as required for the withholding of deportation.

## BACKGROUND

Korablina's father was Russian. Her mother was Jewish. Her father adopted Judaism, and she was raised in the Jewish tradition in the Ukraine. Korablina testified that during the German occupation, her grandmother, mother and aunt were either taken by the Germans or forced into hiding because of their religion.

Korablina testified that early in her life she had to attend technical school because she was denied admittance to the Poly–Technical Institute of Kiev because she was Jewish. After getting a degree, she worked in an automated machinery factory from 1962 until 1990. She testified that she encountered constant obstacles to career advancement because of her religion. She was ultimately fired in 1990 because of her religion

and because her new boss was a member of an ultra-nationalist and anti-Semitic group. Her explanation of the cause of her dismissal is revealing.

Q. Now, let's move up a little ahead in the years to the perestroika years, the mid–80s. When perestroika came to the Soviet Union, how did it affect the situation regarding your Jewish identity?

A. (By Korablina) It only worsened the condition that I was in as well as the condition of all other Jews.

Q. Now, did this worsening of the condition affect you personally?

A. Me personally, yes, it did.

Q. Can you tell the Court how it affected you personally?

A. When the (indiscernible) and the disruptions in the Kiev started taking place, those extremist organizations which previously did not have the right of speech and had to act covertly, they had an open forum at that point in time. They were holding rallies in the city. They were announcing openly that Ukraine should be freed of Jews and, therefore, the Jews have to leave Ukraine. They was saying get out of here. These upheavals also took place everywhere. They were at all factories, plants, including ours.

Q. How did this affect you personally in your day-to-day situation?

A. I personally was fired from my work.

Q. When were you fired?

A. I was fired in the early 1990.

Q. Do you know why you were fired?

A. I was fired when I started asking around and finding out things. And when—at the time of perestroika a new general director was appointed for my plant. He was a member of the ultra-nationalist movement. And then layoffs started. I was laid off at the time of the first waive of layoffs.

Q. Did you inquire as to why you were laid off?

A. I was trying to find out but the list that—well, the majority basically all of them were Jewish.

After six months looking for a job, Korablina secured new employment as a clerical secretary to a Jewish man. In October, 1993, three men came into the office and demanded money from him, claiming that, as a Jew, he was living at the expense of Ukrainian resources. Korablina witnessed the beating and extortion of her Jewish boss. The men took several items of office equipment as well as a list of employees. After the beating, the employees immediately called for an ambulance and the police. The ambulance eventually arrived after thirty minutes, but the police never showed up at all.

After the initial beating, the attackers returned on a monthly basis to extort money. Korablina told a friend at the municipal city hall of the extortion. He said he would try to help. Soon afterward, he disappeared without a trace. Korablina testified that people who protested often "disappeared" in Kiev during that time period.

Korablina also testified that after the attackers beat her Jewish boss and stole a list of employees, she began to receive numerous anti-Semitic telephone calls and notes, sometimes as often as several times a week. The notes threatened to kill her and threatened that if she decided to go to anyone for help, she too could disappear. She did not report the calls to the police. She testified credibly that the police were not interested in protecting Jews.

On another occasion, Korablina was working at a pavilion where her employer was trying to arrange contracts for his business. Two young men approached Korablina when she was alone, demanding she turn over the business' paperwork in her possession. When she refused, they tied her up in a chair, placed a noose around her neck and pulled it tighter until she agreed to release the papers. The attackers looked at her exhibition badge and informed her that her Russian last name could not help her to conceal her Jewish origin. They left her tied to the chair. She testified that she was barely breathing and in a state of shock. She had to go to the hospital for treatment for a brain concussion from being struck in the forehead with a blunt instrument. She did not report this incident to the authorities because she claimed it would be fruitless. Considering what had happened to her missing friend from the municipal city hall, she worried that calling the police would jeopardize her life.

In September 1994, members of the ultra-nationalist group came to the office, ransacked the place, painted a Star of David on the wall, and threatened Korablina's boss. Soon after this incident, her boss also disappeared.

Korablina testified that many Jewish-owned businesses in Kiev suffered from the same treatment at the hands of anti-Semitic hoodlums. She testified that her boss' disappearance finally convinced her it was too dangerous for her to remain in the Ukraine.

Korablina's daughter, Irene Cimbal, was present at the deportation proceeding as a temporary visitor to the United States. Her testimony, found to be credible, corroborated her mother's account of the conditions in the Ukraine and the persecution Korablina had suffered. Her daughter testified that after her mother departed, she moved in with her father. The harassing phone calls and notes became more frequent. Cimbal and her father changed their telephone number and moved in with other family members in a nearby city. Cimbal testified that one night her father returned home after having been severely beaten:

> I helped to open the door and he came in a dreadful condition. He was all beaten up. His entire coat was bloody and apparently the majority of the blood was to his head because he was in a horrible condition and he didn't seem to be mentally together, and he was practically crawling on the wall. I asked him what happened, but he just hugged real hard and he said, "Thank goodness that mom is far away and that she doesn't see it."

During the beating, the attackers threatened, "your kike wife won't be able to hide for long, and it doesn't really matter where she is hiding." Both Korablina's daughter and her husband elected not to report the incident, claiming that the authorities provided

no sympathy and certainly no protection for them.

Cimbal also testified that she was attacked and threatened with rape by men who proclaimed "we did not manage to clarify where is your kike mother, but we could play with you." Cimbal testified that on her way home one evening:

> I felt that someone was following me and as soon as I turned around to see who was it, I was attacked. I know that there was a strong man, some strong men covered my mouth and I could not scream. And he was holding my arms.... I remember a hard blow to my face, and for a moment after I lost my consciousness and I came to, my face was covered with blood, that man was sitting on my legs and he was trying to tear my clothing.

She testified that another man was hovering around all the time and watching for witnesses. She then heard some footsteps and a dog barking. Before leaving her, the attackers said, "you little kike woman, we're not done with you yet." A neighbor stopped the attack and offered to call the police, but the daughter refused. The daughter testified that telling the authorities was useless.

In addition to Korablina's own testimony regarding the police's unwillingness to help her and her fear that they may actually have been collaborating with the ultra-nationalists, Korablina offered her daughter's corroborating testimony and submitted articles detailing the authorities' unresponsiveness to complaints made by Jewish victims in Kiev.

Korablina entered the United States as a visitor. Four days before her visa was to expire, she applied for asylum. After a hearing on the merits, the IJ issued an oral decision denying asylum and withholding of deportation and granting Korablina voluntary departure to Russia. The IJ concluded that what Korablina had described amounted to merely discrimination, and did not rise to the level of persecution. On appeal, the BIA issued its decision dismissing the appeal and designating the Ukraine as the country for deportation.

**DISCUSSION**

**1. Standard of Review**

The BIA's determination that an alien is not eligible for asylum must be upheld if supported by reasonable, substantial, and probative evidence based on the record as a whole. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The decision "can be reversed only if the evidence presented by [the alien] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* (citing *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)). On appeal from the BIA's denial of asylum, the alien must demonstrate that "the record compels the conclusion" that she has a well-founded fear of persecution. *See Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812. An alien who establishes past persecution is entitled to a regulatory presumption that she has a well-founded fear of future persecution. *Singh v. INS*, 94 F.3d 1353, 1360–61 (9th Cir.1996).

**2. Legal Requirements for a Finding of Persecution**

Under 8 U.S.C. § 1158(a), the Attorney General has discretion to grant asylum to an alien determined to be a "refugee." A refugee is defined as any person who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

The Immigration and Nationality Act does not define persecution or specify what acts constitute persecution. This circuit has defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Ghaly*, 58 F.3d at 1431 (quoting *Elias–Zacarias*, 502 U.S. at 489, 112 S.Ct. 812). In addition, acts of violence against a petitioner's friends or family members may establish a well-founded fear of persecution. This court has required, however, that the violence "create a pattern

of persecution closely tied to the petitioner." *Arriaga–Barrientos,* 937 F.2d at 414. Persecution is defined as "an extreme concept that does not include every sort of treatment our society regards as offensive." *Id.* The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment she received rises to the level of persecution. *Singh v. INS,* 134 F.3d 962, 967 (9th Cir.1998).

An alien's well-founded fear must be both subjectively genuine and objectively reasonable. *Elnager,* 930 F.2d at 786 (citing *Elias–Zacarias,* 908 F.2d at 1455). An alien satisfies the subjective component by credibly testifying that she genuinely fears persecution. *Singh,* 134 F.3d at 966. "The objective component requires a showing by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Ghaly,* 58 F.3d at 1428 (quoting *Arriaga–Barrientos v. INS,* 925 F.2d 1177, 1178–79 (9th Cir.1991)). The applicant has the burden of making this showing. *Fisher v. INS,* 37 F.3d 1371, 1376 (9th Cir.1994).

Korablina clearly met the subjective component of the test. The IJ found her testimony to the effect that she fears persecution to be credible. *See Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1395 (9th Cir.1985) (holding that a reviewing court should give deference to an IJ's credibility finding). The remaining question is whether Korablina established that a reasonable person in her situation would fear persecution on the basis of her religion.

The IJ found that Korablina had established by her testimony that she had experienced a "serious [form] of discrimination because she is Jewish." However, the IJ found, citing *Ghaly,* that her numerous experiences did not amount to persecution. The *Ghaly* court held: "Discrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act." *Ghaly,* 58 F.3d at 1431. The issue, then, is whether Korablina indeed suffered mere discrimination, or whether the record compels a finding of past persecution as well as a well-founded fear of future persecution.

Persecution may be found by cumulative, specific instances of violence and harassment toward an individual and her family members not only by the government, but also by a group the government declines to control. *Singh v. INS,* 94 F.3d 1353, 1358 (9th Cir.1996) (citing *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1428 (9th Cir.1994)). "Discrimination, harassment, and violence by groups that the government is unwilling or unable to control can also constitute persecution." *Id.* at 1359 (citing *Arteaga v. INS,* 836 F.2d 1227, 1231 (9th Cir.1988)). "Non-governmental groups need not file articles of incorporation before they can be capable of persecution." A single isolated incident may not "rise to the level of persecution, [but] the cumulative effect of several incidents may constitute persecution." *Id.; see Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997).

In this case, Korablina testified that she witnessed repeated violent attacks and experienced one violent attack herself. Korablina presented evidence of widespread harassment and violence by Ukrainian ultra-nationalists against Jews. The attacks were motivated by an ultra-nationalist hatred of Jews. Korablina testified and submitted evidence supporting this proposition. The ultra-nationalist group was consistently identified in her testimony and submissions. Korablina knew that close associates and friends were disappearing from Kiev. In addition, one of her friends disappeared after he promised her his help to end the ongoing harassment. She witnessed her Jewish boss beaten and threatened by bands of ultra-nationalists who hurled anti-Semitic epithets, ransacked the office, and extorted money to compensate for Jews "living at the expense of Ukrainian resources." Her Jewish boss disappeared after the business had been repeatedly ransacked. The close association of the attacks in the office indicated to Korablina that the violence was motivated by a hatred of the Jewish faith. The attackers expressed their antipathy to the Jewish religion by painting the Star of David on the office walls and by their anti-Semitic statements during the various attacks.

Furthermore, Korablina suffered violent attacks targeted at her specifically. After the ultra-nationalists raided her office and took a list of employees, she began to receive telephone calls and notes threatening her life because of her religion. She was robbed and attacked, tied to a chair with a noose around her neck and threatened with death. This incident resulted in medical treatment for shock and a concussion. Korablina also testified that because she was Jewish she was refused admission to the institute of her choice, encountered obstacles to career advancement, and finally lost her previous job when the department was taken over by an ultra-nationalist boss.

The nature and increasing frequency of the attacks against Korablina and her close associates demonstrated to Korablina the urgency of her leaving. Soon after she left the Ukraine, her husband and her daughter were brutally attacked. During both incidents, the attackers alluded to the fact that their efforts to find Korablina had been unsuccessful, but that they were still seeking her. In both instances, the attackers referred to Korablina as a kike, a derogatory term for a Jew.

Korablina and her daughter both testified that reporting this type of violence against Jews to the Kiev authorities is not helpful and is, in fact, often dangerous. Korablina testified repeatedly that the police, known as the militia, are a part of the same ultra-nationalist and anti-Semitic group, and that the State does not make any effort to protect Jews or to stop anti-Semitism. Korablina also offered supplemental articles supporting her contention. The articles described a pattern of anti-Semitic violence and negligence on the part of authorities in the Ukraine. This evidence brings Korablina's case within the rule that extends the test to groups that the government is unable or unwilling to control. Conspicuous by its absence is any authoritative evidence from the government disputing the thrust of her evidence and of the government's complicity.

 Cumulatively, the experiences suffered by Korablina compel the conclusion that she suffered persecution. Where evidence of a specific threat on an alien's life, and here there were many, is presented in conjunction with evidence of political and social turmoil, the alien has succeeded in establishing a prima facie eligibility for asylum. *See Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988). With all respect, the IJ's determination and the BIA's affirmance that Korablina experienced merely discrimination are not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *See Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995). The suffering inflicted on Korablina because she is Jewish was not simply a "minor disadvantage or trivial inconvenience." *See Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969). It amounted to "the infliction of suffering or harm upon [one] who differ[s] (in race, religion, or political opinion) in a way regarded as offensive." *See id.*

Accordingly, Korablina was entitled to a regulatory presumption that she had a well-founded fear of future persecution because she established that she suffered *past* persecution, and the government failed to show that country conditions had changed. *See Singh v. INS,* 94 F.3d at 1360–61. ("A finding of past persecution triggers a regulatory presumption that the applicant has a well-founded fear of future persecution, which provisionally establishes the applicant's refugee status and eligibility for asylum."); 8 C.F.R. § 208.13(b)(1)(i).

### 3. Eligibility for Withholding Deportation

 In order to be eligible for a withholding of deportation, Korablina must show that evidence in the record demonstrates a clear probability of persecution. Under the INA, the "Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of ... religion." 8 U.S.C. § 1253(h). Petitioner's deportation must be withheld if she has shown a "clear probability of persecution" should she be deported to the Ukraine. *See Vallecillo–Castillo v. INS,* 121 F.3d 1237, 1240 (9th Cir.1996).

 An applicant is entitled to withholding of deportation if she shows that her life

or her freedom would be threatened on account of her religion. *Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1452 (9th Cir.1985). She must demonstrate that it is "more likely than not" that she will be persecuted were she to return. *Id.; see also* 8 C.F.R. § 208.16(b)(1) ("[t]he applicant's life or freedom shall be found to be threatened if it is more likely than not that [s]he would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.").

■■■■ A finding of past persecution triggers a regulatory presumption that the applicant's "life or freedom would be threatened if deported." *Vallecillo–Castillo,* 121 F.3d at 1240 (quoting 8 C.F.R. § 208.16(b)(2) (internal quotation marks omitted)). A "key factor in finding evidence sufficient for withholding of deportation is whether harm or threats of harm were aimed against petitioner specifically." *Gonzales–Neyra v. INS,* 122 F.3d 1293, 1297 (9th Cir.1997) (quoting *Vilorio–Lopez v. INS,* 852 F.2d 1137, 1141 (9th Cir.1988)). To rebut this presumption, the INS must show by a preponderance of the evidence that country conditions have so changed that it is no longer likely that the applicant would be persecuted there. *Vallecillo–Castillo,* 121 F.3d at 1240. The INS has not done so here. There is every indication in the record that Korablina would suffer the same ongoing persecution now suffered by her family. The fact that members of her family were severely beaten soon after she left the Ukraine, with specific threats made regarding her absence, indicates that the persecution would continue. In addition, Korablina submitted numerous articles which demonstrate that discrimination, harassment, and violence against Jews continues in the Ukraine.

### CONCLUSION

Therefore, we grant the petition for review and reverse the BIA's denial of Korablina's request for asylum and withholding of deportation. Because asylum is granted at the discretion of the Attorney General, we remand that portion of the case for the Attorney General to exercise that discretion.

PETITION GRANTED and REMANDED.