**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 23 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VERA ALEKSEYEVNA
BATALOVA, VALERIY
SEMENOVICH BATALOV, and
IRINA V. BATALOVA,

      Petitioners,

    v.

JOHN ASHCROFT, United States
Attorney General,

      Respondent.

No. 02-9588

---

**ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS
(BIA Nos. A77-886-527, A7-886-528, A77-886-529)**

---

Beverly W. Oserow, Denver, Colorado, for Petitioners.

David E. Dauenheimer, Attorney (Robert D. McCallum, Jr., Assistant Attorney
General, and Jeffrey J. Bernstein, Senior Litigation Counsel, with him on the
brief), Office of Immigration Litigation, United States Department of Justice,
Washington, D.C., for Respondent.

---

Before **HENRY** , **HOLLOWAY** , and **ANDERSON** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

Petitioners Vera Batalova, her husband, Valeriy Batalov, and their daughter, Irina Batalova, are natives and citizens of Russia. They petition for review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture. We deny the petition and affirm.

## BACKGROUND

Petitioners entered the United States on February 15, 1999, as tourists with permission to stay for six months. On February 11, 2000, they filed applications for asylum under the Immigration and Nationality Act ("INA") § 208, 8 U.S.C. § 1158. Their applications were administratively denied and referred to the Immigration Court. Petitioners were charged with being subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States beyond the date authorized without receiving permission from the Immigration and Naturalization Service ("INS"). [1]

At a hearing before the IJ, petitioners admitted having remained in the United States longer than permitted and conceded that they were subject to

---

[1]The INS ceased to exist on March 1, 2003, and its functions were transferred to the U.S. Citizenship and Immigration Services ("USCIS") within the newly formed Department of Homeland Security.

removal. They sought asylum and withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and under the Convention Against Torture. [2] After conducting a hearing, the IJ denied their applications but granted them voluntary departure. Petitioners appealed the IJ's decision to the BIA, where a single Board member adopted and affirmed the IJ's decision, with an additional finding, in accordance with the new streamlining regulations. See 8 C.F.R. § 3.1(e)(5). [3] Petitioners seek review of that order.

Petitioners claim persecution based upon Vera's Armenian ancestry. As indicated, petitioners are natives and citizens of Russia. Vera was born in Nagutskove, Russia. According to Vera's birth certificate, her mother was Armenian and her father was Russian. She listed her nationality as Russian on the birth certificate of her daughter, petitioner Irina, as well as on her internal passport. Both parents of petitioner Valeriy (Vera's husband and father of Irina)

---

[2]The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (1998). See 8 C.F.R. § 208.16(c)(2), .17. It permits withholding of removal for an alien who establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. § 208.16(c)(2).

[3]These regulations have since been recodified and renumbered, and 8 C.F.R. § 3.1(e)(5) is now 8 C.F.R. § 1003.1(e)(5). We refer in this opinion to the version in effect at the time petitioners' decision was rendered.

were Russian. Vera concedes that her birth surname is Russian, as is her married name.

She attended secondary school in Russia, followed by two years of technical school. Valeriy attended the same technical school. They were each assigned positions in Pyatigorsk, Russia, in 1972. They married in 1973.

Vera asserts that, because of an ongoing war in Chechnya, many people fled from that area to Pyatigorsk. She avers that in 1994 she joined the North Caucus Committee ("NCC") as a volunteer, helping Armenian refugees arriving in Pyatigorsk find housing and jobs. She lived and worked in Pyatigorsk without incident until 1995. She states that her work supervisor was a Cossack, who disliked the influx of Armenian refugees. She testified that problems that occurred in the city were unfairly blamed on the Armenians.

She claims that one day in 1995, she confronted her supervisor about his negative views towards Armenians and told him that her mother had been Armenian, a fact about which her supervisor was apparently unaware. Vera asserts that after that confrontation, her supervisor told her he would make her work situation intolerable, and he began giving her very difficult assignments and prevented her from using available equipment. She also claims her husband's employer tried to pressure her husband into making Vera stop volunteering for the NCC. She testified that the company for whom she and her husband worked

finally stopped paying their salaries and they quit in 1995 so they could find some other way to support themselves. [4] They did not file any complaint concerning the company's conduct because "the Cossacks have power in Russia [and] [t]hey work together with government." Admin. R. at 75.

Vera asserts that in January 1996, several men smelling of alcohol came to their apartment and beat her and her husband. In her asylum application, she stated that the men tied her husband up and knocked her teeth out. She did not mention these specifics in her initial testimony before the IJ, although on cross-examination she stated her front teeth had been knocked out but were later replaced. She testified that they threatened to rape her daughter, stating "now your daughter will have intercourse with the Cossacks she will know what a real man is." Id. at 61. She claimed that she was knocked unconscious and, when she awoke, her daughter was missing. She stated that they did not go to the police because they thought the police would not help. Instead, Vera and Valeriy looked for Irina by themselves and, when they were unable to find her, they returned to their apartment. Irina arrived home "sometime later" and apparently told her parents that the men had driven her somewhere, drank alcohol, and told her they would rape her. Vera testified that "one of them, he was – maybe he was too

---

[4]The record is not completely clear on whether Vera and her husband were working for the same company or different companies at the time she began experiencing trouble at work and they both stopped receiving salaries.

drunk, maybe he – it was a joke, he broke a bottle of – just glass bottle and he said, now he will kill her." Id. at 62-63. She claims that Irina tried to kick the man but instead cut her foot on the bottle. Id. at 63. The men then threw Irina from their car, and she found her way back to her parents' apartment. Vera claims they did not file a police report regarding this incident because the police support the Cossacks.

Vera testified that Irina then went to nursing school and moved out of their apartment to live closer to the school. Vera claims that she and Valeriy also no longer stayed in their apartment, but instead stayed at friends' houses, hotels or houses they were fixing up for newly arrived refugees. They returned to their apartment periodically to care for their pets and to pick up clothes or other necessities. Vera avers that in November 1996, she and Valeriy went to their apartment and found several men breaking their furniture. She claims that they fled and determined "never" to return to their apartment. Id. at 64. She further claims that occasionally they would secretly check on their apartment and find notes threatening their lives because they continued to help refugees.

Vera further alleges that two years later (in November 1998), she and her husband encountered a Cossack patrol truck at one of the homes they had just finished fixing up for some refugees. She claims that she recognized one of the men from her previous encounters at her apartment, and she avers that they

-6-

"immediately recognize[d]" her and her husband.      Id.  She says they ran and hid and were saved by the arrival of the truck with the refugees in it.  She testified that they never returned to their apartment thereafter.

Vera further testified that her older daughter, Svetlana, who was active in the Pentecostal church, fled to the United States in 1996, where she received asylum based upon religious persecution.  She said that in August 1998, she and Valeriy learned that Svetlana was seriously ill.  They decided to visit Svetlana, so petitioners went to Moscow and obtained Russian passports and United States tourist visas.  Vera alleged that at the time they applied for their visas, they intended to return to Pyatigorsk.  She said that, before they returned to Pyatigorsk from Moscow, they called "some people," who told them they had "no apartment anymore."  Id. at 66.  She testified that they later received a letter telling them that two men had come to their apartment looking for them and that, one week later, their apartment burned down. [5]  In fact, as she conceded on cross-examination, several apartment units burned in the fire.  She said that she and her friends assumed the fire was set by Cossacks.  She claims that this event changed their outlook and made them decide to stay in the United States and seek asylum.

---

[5]On cross-examination, Vera testified that the fire occurred later the same night the men came to their apartment looking for petitioners.  Admin. R. at 89.

Petitioners claim they will be in great danger if they return to Russia, because of Vera's Armenian ancestry.

The IJ conducted a hearing, at the conclusion of which he determined that petitioners had demonstrated neither past persecution nor a well-founded fear of future persecution. The IJ found that Vera's testimony "was not sufficiently detailed, consistent or believable to provide a plausible and coherent account for the basis for their fears." Oral Decision of the IJ at 9, Admin. R. at 39. The IJ noted that "none of the [petitioners] . . . look Armenian," that Vera "is . . . half Russian from her father and Russian through marriage through her husband," and that their name was Russian. Id. at 9-10, Admin. R. at 39-40. The IJ also indicated that he "has not heard of the North Caucus Committee membership group whatsoever," and that the NCC was not mentioned in the State Department's Country Conditions Report on Russia. Id. at 10, Admin. R. at 40. Further, the IJ noted that an affidavit in the administrative record was from an Armenian individual still living in Russia who had also worked for the NCC, and "if he is able to remain residing in Russia without complications [the IJ] cannot comprehend why the [petitioners] cannot do the same, particularly since this individual is Armenian." Id. at 11, Admin. R. at 41. Finally, the IJ noted that petitioners failed to make any showing that the threat of persecution exists countrywide. Id.

The IJ also concluded petitioners had failed to show that they were eligible for withholding of removal or relief under the Convention Against Torture, noting that while he was "well aware that the situation in Russia is not good regarding Armenians[,] . . . President Putin has in fact started measures to try to counter the nationalistic movement in that particular country and is trying to change things to protect all individuals in Russia." Id. at 12, Admin. R. at 42. He further observed that "there has been numerous testimony on prior occasions that there are certain areas in Russia where Armenian or persons of Armenian descent do in fact reside without problems." Id.

Petitioners appealed that decision to the BIA, where a single BIA member affirmed the decision, adopting the IJ's reasoning and adding that "although the respondent identified the assailants as Cossacks, the respondent did not convince the Board that those individuals were in any way acting on behalf of the Russian government, or that the government makes no attempts to control those types of individuals." Order, Admin. R. at 2. In so doing, the BIA employed one of the relatively new streamlining summary affirmance regulations, 8 C.F.R. § 3.1(e)(5).

Petitioners seek review of that order, arguing (1) the BIA failed to comply with its own regulation and erred in failing to submit this case to a three-member panel of the BIA for decision; (2) the BIA member made an erroneous factual finding and used an improper legal standard in determining that petitioners had

failed to establish persecution by the Cossacks; (3) the streamlining summary affirmance regulations are unconstitutional; and (4) the IJ made erroneous factual and legal determinations in denying petitioners' applications.

## DISCUSSION

Regulations governing the procedures before the BIA provide that cases on appeal from an IJ's decision are initially screened under 8 C.F.R. § 3.1(e). Unless a case meets the standard for assignment to a three-member panel of the BIA under § 3.1(e)(6), the case is assigned to a single member of the BIA. That member may summarily affirm the IJ's decision without an opinion, if the Board member determines that the case meets certain requirements. See 8 C.F.R. § 3.1(e)(4). If the Board member determines that the case is not appropriate for summary affirmance without an opinion, he reviews the case pursuant to 8 C.F.R. § 3.1(e)(5), which provides as follows:

> *Other decisions on the merits by single Board member*. If the Board member to whom an appeal is assigned determines, upon consideration of the merits, that the decision is not appropriate for affirmance without opinion, the Board member shall issue a brief order affirming, modifying, or remanding the decision under review, unless the Board member designates the case for decision by a three-member panel under paragraph (e)(6) of this section under the standards of the case management plan. A single Board member may reverse the decision under review if such reversal is plainly consistent with and required by intervening Board or judicial precedent, by an intervening Act of Congress, or by an intervening final regulation.

8 C.F.R. § 3.1(e)(5).  Only certain cases are reviewed by a three-member panel,

pursuant to 8 C.F.R. § 3.1(e)(6).    [6]  Furthermore, the BIA only reviews an IJ's

factual findings for clear error.    Id. § 3.1(d)(3).

## I.  Compliance with regulations

Petitioners first argue that the BIA "failed to comply with the provisions of

8 C.F.R. § 3.1(a) and (e)."  Pet'rs' Opening Br. at 22.    [7]  Because it is clear that the

BIA member acted pursuant to § 3.1(e)(5), we consider whether he complied with

---

[6]Section 3.1(e)(6) provides as follows:

Cases may only be assigned for review by a three-member panel if
the case presents one of these circumstances:
    (i) The need to settle inconsistencies among the rulings of
different immigration judges;
    (ii) The need to establish a precedent construing the meaning
of laws, regulations, or procedures;
    (iii) The need to review a decision by an immigration judge or
the Service that is not in conformity with the law or with applicable
precedents;
    (iv) The need to resolve a case or controversy of major
national import;
    (v) The need to review a clearly erroneous factual
determination by an immigration judge; or
    (vi) The need to reverse the decision of an immigration judge
or the Service, other than a reversal under § 3.1(e)(5).

8 C.F.R. § 3.1(e)(6).

[7]Petitioners make a somewhat confusing argument that the BIA member
failed to comply with 8 C.F.R. § 3.1(a)(7).  We need not address this because
§ 3.1(a)(7) is irrelevant to this case.

that regulation.  Petitioners argue he did not because his decision "made no indication that the Board had actually reviewed the record below."   Id. at 24.  We disagree.  In affirming the IJ's decision, the BIA member cited   Matter of Barbano , 20 I & N Dec. 872, 874 (BIA 1994), with the parenthetical note that "adoption or affirmance of a decision of an [IJ], in whole or in part, is simply a statement that the Board's conclusion   upon review of the record   coincides with those that the [IJ] articulated in his or her decision."  Order, Admin. R. at 2 (emphasis added) (quotation omitted).

Furthermore, the regulation does not require the Board to specifically   state that it has reviewed the record.  We assume the BIA member reviewed the record prior to deciding to adopt the IJ's decision.  Absent any indication to the contrary, we presume BIA members do their job thoroughly.   See Yuk v. Ashcroft , No. 02-9546, 2004 WL 79095, at *8 (10th Cir. Jan. 20, 2004) ("'That a one-sentence order was entered is no evidence that the BIA member did not review the facts of [petitioner's] case.'" (quoting   Mendoza v. U.S. Att'y Gen.  , 327 F.3d 1283, 1289 (11th Cir. 2003)).

Petitioners also argue that the BIA member should have referred this case to a three-member panel pursuant to § 3.1(e)(6), because, they assert, the IJ's decision contains "significant errors of law and fact."  Pet'rs' Opening Br. at 24.  The government responds that the single BIA member's decision to decide a case

by means of § 3.1(e)(5) is a decision committed to the absolute discretion of the BIA and therefore not subject to judicial review because it requires an assessment of "not only whether a particular case was correctly decided, but also whether, against the backdrop of an extraordinarily large caseload, the case involves such novel or complex issues that a full Board decision is required." Resp't's Br. at 17-18.

The government has made this argument in various cases around the country without success, although the argument has sometimes only been unsuccessful in dicta. See Denko v. INS , No. 02-3746, 2003 WL 22879815, at *10 (6th Cir. Dec. 8, 2003) (assuming, without deciding, "that judicial review properly is employed to assess whether the BIA correctly designated a case for summary affirmance"); Haouid v. Ashcroft , No. 02-2395, 2003 WL 22776433, at *4 (1st Cir. Nov. 25, 2003) (noting that "[e]specially when the Board's review of an IJ's decision often hinges on Circuit court precedent, we are well-equipped, both statutorily and practically, to review a decision to streamline"); Falcon Carriche v. Ashcroft , No. 02-71143, 2003 WL 22770121, at *6 (9th Cir. Nov. 24, 2003) ("[W]e do not embrace the government's argument that the streamlining decision is inherently discretionary."). Review by a three-member panel under § 3.1(e)(6) is permissible only if the case meets the specified regulatory criteria. Those criteria, including such things as (a) the need to settle inconsistencies

between IJs, (b) the need to establish precedent construing laws, regulations or procedures, (c) the need to review the particular IJ's decision because it fails to conform to law or precedent or contains clearly erroneous factual determinations and (d) the need to resolve a case of major national import, are all well within our capability to review and assess. Indeed, they are the kinds of issues we routinely consider in reviewing cases, and they have nothing to do with the BIA's caseload or other internal circumstances. Thus, at least for the purposes of this case, we are able to review the BIA member's decision to decide this case under § 3.1(e)(5) rather than § 3.1(e)(6). [8] As our review of the merits of petitioners' case will reveal, we find no error in that decision.

## II. BIA's factual finding and legal analysis regarding persecution

Petitioners next argue that the BIA made a "clearly erroneous factual determination and applied an improper legal standard in determining that the harm Petitioners suffered at the hands of the Cossacks did not qualify as persecution." Pet'rs' Opening Br. at 25. "We have held that 'the possible persecution to be

---

[8]Moreover, in this particular case, it makes little difference whether the BIA member properly or improperly determined to utilize § 3.1(e)(5) to review the IJ's decision, or whether the BIA acted through a single member or a three-member panel, because we directly review the IJ's decision, which the BIA member adopted. Thus, "our ability to conduct a full and fair appraisal of [petitioners'] case is not compromised." Georgis v. Ashcroft, 328 F.3d 962, 967 (7th Cir. 2003).

established by an alien in order for him to be eligible for asylum may come from a non-government agency which the government is unwilling or unable to control.'" Krastev v. INS, 292 F.3d 1268, 1275-76 (10th Cir. 2002) (quoting Bartesaghi-Lay v. INS, 9 F.3d 819, 822 (10th Cir. 1993)). The BIA member essentially incorporated and applied that standard when he observed that Vera "did not convince the Board that those individuals [the Cossacks] were in any way acting on behalf of the Russian government, or that the government makes no attempts to control those types of individuals." Order, Admin. R. at 2. Indeed, making no attempt to control suggests an unwillingness to control. The BIA member therefore adequately conveyed the proper standard.[9]

Petitioners argue further that, even if the BIA member expressed the proper legal test, his conclusion that petitioners failed to show that the Russian government was unwilling to control the Cossacks was not supported by the administrative record. Rather, they assert that "it is clear that not only is the Russian government at all levels unable and unwilling to control the Cossacks, the government in fact supports the Cossacks and incorporates them into local governments." Pet'rs' Opening Br. at 27. Because we conclude, infra, that petitioners fail to establish that they suffered past persecution, or have a well-

---

[9]Furthermore, the IJ's decision, which the BIA adopted, stated the "unwilling or unable to control" standard.

founded fear of future persecution, at the hands of individuals they identify as Cossacks, we do not have to address this issue.

### III. Due process

Petitioners next argue that the Board violated their due process rights "by issuing a decision without opinion and by failing to articulate sufficient reasons for upholding the decision of the IJ." Id. at 30. In accordance with every other circuit to address the issue, we recently upheld the validity of the Board's streamlining regulations which permit a single Board member to summarily affirm an IJ's decision without an opinion, pursuant to 8 C.F.R. § 3.1(a)(7) (now codified at 8 C.F.R. § 1003.1(a)(7)). [10] See Yuk, No. 02-9546, 2004 WL 79095, at **4-9. In this case, a single Board member affirmed and expressly adopted, with one modification, the IJ's decision. That poses no due process problem. See id.; see also Panrit v. INS, 19 F.3d 544, 546 (10th Cir. 1994) ("We . . . hold that where the Board explicitly recites that it has reviewed the record and the immigration judge's decision and that it is content to rest its decision on the immigration judge's reasoning, adoption of the immigration judge's decision does not present any difficulty in terms of the sufficiency of the Board's articulation of

---

[10] 8 C.F.R. § 3.1(e)(4) (now codified at § 1003.1(e)(4)) provides for essentially the same summary affirmance without opinion as § 3.1(a)(7).

its reasoning."). Petitioners argue that the Board member's decision in this case fails to state specifically that it has in fact reviewed the record before adopting the IJ's decision and that failure violates due process. We have already rejected that argument. In any event, because the Board member adopted the IJ's decision, and made a specific additional finding, we have the IJ's decision, as modified by the Board member's additional finding, to review. Thus, we are able to provide a meaningful review of the agency's decision in this case.

**IV. IJ's decision**

Finally, petitioners challenge the merits of the IJ's decision, contending that the judge erred in various findings he made. Petitioners argue the IJ erred in finding: (1) that Vera could not be Armenian because she did not "look Armenian" and did not have an Armenian name; (2) that the NCC did not exist because he had never heard of it, the State Department Report on Russia did not mention it, and Armenian organizations in other Russian cities were not called the NCC; (3) that petitioners will not suffer persecution because of their involvement with the NCC because a witness who provided an affidavit in support of Vera had also been active in the NCC and was able to live safely in Russia; (4) that Vera's testimony "was not sufficiently detailed, consistent or believable to provide a plausible and coherent basis for her fears," Pet'rs' Opening Br. at 49; and (5)

"[t]he IJ erred as a matter of law in finding that Petitioners failed to satisfy the burden of proof required for a grant of asylum." Id. at 51.

To obtain asylum, petitioners must prove that they are refugees as defined in 8 U.S.C. § 1101(a)(42)(A), and then persuade the Attorney General to exercise his discretion and grant relief under 8 U.S.C. § 1158(b). See Yuk, 2004 WL 79095, at *9. Because the IJ determined that petitioners failed to establish refugee status, we need only review that initial question. We review that decision to determine "whether the record on the whole provides substantial support for that determination or, rather, is so decisively to the contrary that a reasonable factfinder would have concluded petitioner[s] [are] refugee[s]." Vatulev v. Ashcroft, No. 02-9573, 2003 WL 23098615, at *1 (10th Cir. Dec. 31, 2003). In accordance with that deferential standard of review, "we will not question the immigration judge's or BIA's credibility determinations so long as they are substantially reasonable." Woldmeskel v. INS, 257 F.3d 1185, 1192 (10th Cir. 2001).

Petitioners allege that they have established both past persecution and a well-founded fear of future persecution. See 8 C.F.R. § 208.13(b). The IJ concluded that they had established neither. In so doing, he found that Vera's testimony was "not sufficiently detailed, consistent or believable to provide a plausible and coherent account for the basis for their fears." Oral Decision at 9,

Admin. R. at 39. After reviewing the record in accordance with the prescribed deferential standard of review, we cannot say that the IJ's credibility findings were substantially unreasonable, nor can we say that his conclusion that petitioners failed to qualify as refugees is "contrary to what a reasonable factfinder would have been compelled to conclude." Vatulev, 2003 WL 23098615, at * 3. [11] We therefore conclude that petitioners have "failed to carry

---

[11]Petitioners argue vigorously that the IJ erred in placing any weight upon his conclusion that petitioners do not "look" Armenian. While obviously that could not form the sole basis for a conclusion that an individual would not suffer persecution because of Armenian ancestry, the point is that neither Vera's appearance nor her name nor her identifying documents would give an individual reason to believe that she was Armenian. Petitioners point to nothing in the administrative record which suggests that such an individual is subject to persecution in Russia.

Moreover, while petitioners described an assault by apparently drunken individuals who identified themselves as Cossacks, and an incident in which their apartment was vandalized, Vera's testimony did not provide any convincing "indicia of ethnic persecution – to distinguish them from acts of common criminality or personal hostility." Vatulev, 2003 WL 23098615, at *2 (footnote omitted). Further, they assumed their apartment was burned by Cossacks, but provide no convincing evidence that their assumption had any basis. Vera's vague and conclusory testimony about threatening notes they received "never established a concrete connection between these [notes] and any overt violence or mistreatment." Id. Her equally vague testimony about her company's cessation of payment, which compelled her and her husband to quit, fails to provide any details as to the reason for the company's actions or whether she and Valeriy attempted to find other employment and were denied because of Vera's Armenian ancestry. Nor does she adequately explain why they never reported any incidents to the police or other authorities, other than her unsubstantiated assertion that the police were in league with the Cossacks. More importantly, the IJ heard all of her testimony in person and was in the best position to observe her and evaluate her credibility. He found her testimony not believable, a determination which we find is substantially reasonable.

-19-

the heavy burden placed on those challenging adverse asylum determinations" and we accordingly deny their petitions for review.     Id. at *1.

Having failed to establish entitlement to asylum, petitioners also fail to establish entitlement to withholding of removal which, we have acknowledged, requires a petitioner to meet a higher standard than that for asylum.     See Krastev , 292 F.3d at 1271.  Petitioners have also failed to establish the requisite likelihood of being tortured so as to establish entitlement to relief under the Convention Against Torture.

## CONCLUSION

For the foregoing reasons, we deny the petition for review and affirm the BIA's decision to deny asylum, withholding of deportation and relief under the Convention Against Torture.