**F I L E D**

UNITED STATES COURT OF APPEALS

**July 6, 2005**

FOR THE TENTH CIRCUIT

LOISE NJERI GICHEMA,

       Petitioner,

v.

ALBERTO R. GONZALES, [*] Attorney
General of the United States,

       Respondent.

No. 04-9536
(Agency No. A96-00-909)
(Petition for Review)

## ORDER AND JUDGMENT [**]

Before **TACHA**, Chief Judge, **HENRY**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination

of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

---

[*]    On February 4, 2005, Alberto R. Gonzales became the United States
Attorney General. In accordance with Rule 43(c)(2) of the Federal Rules of
Appellate Procedure, Mr. Gonzales is substituted for John Ashcroft as the
respondent in this action.

[**]    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Loise Njeri Gichema is a citizen of Kenya who faces removal from this country. She seeks review of the decision of the Board of Immigration Appeals (BIA) summarily affirming the decision of an Immigration Judge (IJ) denying her application for asylum, withholding of removal, and relief under the Convention Against Torture. [1] We affirm.

FACTS

Petitioner entered the United States on May 15, 2002 using a non-immigrant visa that authorized her to remain in this country until November 14, 2002. She remained beyond that date without authorization and has conceded her removability. On April 11, 2003, she testified concerning her application for asylum and other forms of relief at a hearing before the IJ. The IJ found her testimony credible.

Petitioner was born in Kenya in 1945. She is a member of the Kikuyu tribe and a Protestant Christian. Historically, Kikuyu tradition called for girls of the tribe to undergo female "circumcision" or clitoridectomy, a form of female genital mutilation (FGM), as part of their initiation into adulthood. As a Christian, however, petitioner never underwent this painful and dangerous tribal

---

[1] Petitioner focuses her appellate arguments on the denial of her asylum claim. *See* Aplt. Opening Br. at 32. Consequently, we do not address the remaining bases for relief presented to the agency.

circumcision rite. Nor did she or her husband require her daughters to undergo FGM.

Petitioner lived for approximately twenty years in Kenya's capital, Nairobi. During her years in Nairobi, neither she nor her family was persecuted in any way for her beliefs or ethnicity. Nor was she harassed there for her status as an uncircumcised female. While the countryside in Kenya is essentially divided between different tribes, petitioner testified that members of all the tribes live in Nairobi in relative harmony.

Petitioner obtained a college-level education and is trained as a therapist. She worked for the Kenyan government for 29 years. Her husband worked as an accountant at a firm that was partially government sponsored. Petitioner asserts that after a change in the government, she and her husband were eventually compelled to retire. Their troubles began after they chose to relocate from Nairobi to a previously-purchased home and five-acre farm in Thika in the Central Province, part of a Kikuyu tribal area.

Petitioner and her husband, comparatively wealthy erstwhile city-dwellers, felt they had little in common with their new, rustic neighbors, who were impoverished and uneducated. Tensions increased greatly when petitioner's daughter made the unusual decision to marry an outsider from a different tribe. Prior to the wedding, in accordance with tradition, petitioner and her husband met

with members of the community and her clan to discuss matters concerning the wedding and her daughter's dowry. During these discussions, petitioner's husband disclosed with some pride that neither petitioner nor their daughters were circumcised.

Petitioner's husband evidently did not anticipate the firestorm that his revelation would produce among his neighbors and future in-laws. Clan members abruptly broke off the dowry discussions. Rumors began to spread among the community of the "uncleanliness" of petitioner and her daughters. Petitioner's husband and son were ostracized in the community. At the market, petitioner began receiving threats that she or her daughters would be forcibly circumcised or killed if they resisted circumcision. Their family cattle were barred from grazing in the common grazing area, and they had to close their small food kiosk because no one would buy from them anymore.

A violent sect known as the "Mungiki" is active in the Central Province. The Mungiki are traditionalists, who seek a return to pre-Christian Kenyan tribal customs. They advocate FGM, and have been known to forcibly circumcise unwilling females as an act of piety toward traditional Kenyan gods. Petitioner asserts that after her status as a non-circumcised person became known, the Mungiki targeted her family for threats and persecution.

-4-

On December 12, 2001, as petitioner's husband was on his way home from town, he encountered a group of men who pelted his car with rocks, severely damaging it but not physically injuring him. The men identified themselves as Mungiki, and stated they had been ordered by the gods to cast out the devil from petitioner's family. They threatened to forcibly circumcise petitioner, calling her a "dirty woman."

Between January 1999 and January 2002, petitioner's three daughters left Kenya and came to the United States on student visas. In January 2002, a group of about thirty persons invaded petitioner's homestead. Petitioner and her family could hear them yelling that they were there for petitioner and that "today is the day." Guard dogs prevented the invaders from entering the family home. Two of the dogs were poisoned and killed. The intruders left, promising to return.

Petitioner reported both this instance and the stoning incident to the authorities. She described the official response as follows:

A. We reported to the area, area administration and he said he is also in fear, he was also in fear that he, his life was also in fear so he was unable to take action, but he said they are going to investigate and that was the end of it.

[. . .]

Q. Did he say who he was in fear of?

A. Of the group of Mangiki [sic] because they are too many in the area and they, when they take their cases to the meetings they are told to investigate.

Admin. R. at 77-78.

Although the Kenyan government opposes the Mungiki and the practice of forced FGM, petitioner stated that it will be difficult to stop the Mungiki because they have protectors in the government and are deeply rooted in society. Petitioner presented evidence that certain government officials are suspected of aiding and protecting the Mungiki.

On May 14, 2002, petitioner left Kenya and came to the United States. Her husband has subsequently informed her that the Mungiki have returned to their house several times looking for uncircumcised women.

## ANALYSIS

### 1. Summary and standard of review

The IJ denied petitioner's application for asylum on several grounds. First, he found that she failed to demonstrate persecution on the basis of political opinion or her membership in a social group. Second, the incidents she described failed to rise to the level of past persecution. Third, she failed to show that the threat of persecution existed country-wide. Finally, he found that the Kenyan government was not unwilling or unable to control the Mungiki. The IJ also noted that petitioner's family members, including her husband, son, sisters, brother, and mother, continued to live in Kenya without any apparent evidence of persecution.

"Since the BIA summarily affirmed the IJ's decision, we review the IJ's analysis as if it were the BIA's." *Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1045 (10th Cir. 2004). We review the IJ's factual findings for substantial evidence in the record. *Nguyen v. INS*, 991 F.2d 621, 625 (10th Cir. 1993). The IJ's findings of fact are conclusive unless the record demonstrates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

To be eligible for asylum, an alien must first show that she is a "refugee." *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004). To establish refugee status, the applicant must demonstrate that she has suffered past persecution or has "a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Persecution" under this section includes persecution by a non-governmental group that the government is "unwilling or unable to control." *Batalova v. Ashcroft*, 355 F.3d 1246, 1253 (10th Cir. 2004) (quotation omitted). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Wiransane*, 366 F.3d at 893 (quotation omitted). We will not reverse the agency's decision unless the

-7-

evidence compels the conclusion that petitioners have a well-founded fear of persecution based on one of the protected grounds. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

In this petition for review, petitioner contends that the evidence compels conclusions (1) that she suffered past persecution and has a well-founded fear of future persecution on account of her membership in a particular social group; (2) that it would not be reasonable to expect her to relocate within Kenya to avoid future persecution by the Mungiki; and (3) that the government of Kenya is unable or unwilling to control the Mungiki sect.

Giving the required level of deference to the agency decision, we conclude that petitioner has failed to show her entitlement to asylum. The evidence shows that she could relocate within Kenya to avoid persecution. Specifically, our analysis is as follows. Even assuming that petitioner has shown that she is a member of a recognized "social group," and that the Mungiki are a group that the Kenyan government is unable to control, she fails to show past persecution. On the question of future persecution, the evidence also shows that petitioner could avoid being persecuted by relocating to Nairobi. Consequentially, the burden shifts to petitioner to show that it would be unreasonable for her to relocate to Nairobi to escape any future persecution she might face upon her return to Kenya.

Petitioner fails to meet this burden. She therefore does not qualify as a "refugee" within the meaning of the Act.

## 2. Past persecution

We begin with the issue of past persecution. The relevant inquiry before the agency was whether petitioner had shown that she suffered (a) past persecution (b) by a group the Kenyan government was unwilling or unable to control (c) on account of her membership in a cognizable social group. We must determine, giving appropriate deference to the agency's findings, whether the IJ erred in determining that petitioner did not meet any of these criteria. Having carefully examined the record, we conclude that even if petitioner has made an adequate showing concerning the last two elements of this equation, the incidents on which she relies did not rise to the level of "past persecution."

### a. Kenyan government's ability to control Mungiki

The evidence demonstrates that the government of Kenya is not *unwilling* to challenge FGM or the Mungiki. The IJ found that "the government is constantly arresting [the Mungiki], fighting them, and basically after them. So the Court feels that the government is, in fact, trying to control these individuals and to arrest them and to convict them for the crimes that they have committed." Admin. R. at 50-51. This characterization is supported by evidence in the country reports. The 2002 Country Report for Kenya states that Kenya's former president

called for action against the Mungiki, and that the police forcibly disrupted some of its meetings and arrested several Mungiki members in 2001. Admin. R. at 123, 127, 135, 136-37. FGM has been banned by the former president of Kenya and government-controlled hospitals and clinics are prohibited from practicing it. *Id.* at 143. It is illegal to perform FGM on women under eighteen years of age in Kenya. *Id.*

The evidence is less substantial, however, on the issue of whether the government is *able* to control the Mungiki. The Mungiki has been described in newspaper articles as "increasingly difficult to control." *Id.* at 194. It is said that when the Mungiki strikes, it leaves the authorities "apparently helpless." *Id.* The group is apparently becoming more violent, and the African Church Information Service notes that authorities seem to have trouble eradicating the Mungiki. *Id.* at 218.

The strongest evidence of the government's inability to control the Mungiki comes from the fact that when petitioner and her husband reported the incidents described in her petition to the authorities, the authorities promised to investigate but stated they were themselves intimidated by the Mungiki and apparently did nothing to bring the perpetrators to justice. This is a strong indicator of a group that the government is unable or unwilling to control. *See Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996) (noting that petitioner had "reported each assault and

threat to the police and that, although [he] identified his assailants by name, the police failed to respond to any of his crime reports. This failure by the authorities to protect [the petitioner] and his family clearly indicates that the police either could not or would not control the ethnic Fijians who threatened [petitioner] and his family.").

The IJ did not discuss this factor when he concluded that the government was "trying" to control the Mungiki. At most, his decision supports a conclusion that the government is "willing" to control the Mungiki, not that it is "able" to do so. We will therefore assume that petitioner has made an adequate showing that the Kenyan government is "unable" to control the Mungiki.

### b. Cognizable social group

Before the BIA, petitioner argued that she belonged to a social group consisting of "members of the same family who are uncircumcized Kikuyu women who have been specifically identified and thus targeted by the Mungiki for forcible FGM." Admin R. at 16. In her brief on appeal, she attempts to modify the defined group somewhat, to "Christian, educated Kikuyu women who have not been subjected to ritual circumcision and who have not subjected their daughters to the ritual." Aplt. Opening Br. at 19. The IJ concluded that petitioner failed to show that she had been persecuted as part of a recognized "social group." There is some authority that women who fear FGM do constitute a "social group" within

-11-

the meaning of § 1101(a)(42)(A).  *See, e.g., Abay v. Ashcroft*, 368 F.3d 634, 638-40 (6th Cir. 2004).  We will assume for the purposes of this decision that petitioner does belong to a cognizable "social group" within the meaning of the statute.

### c.  Incidents described as past persecution

Since petitioner arguably satisfies the other two elements of the past persecution inquiry, the key element now becomes whether the incidents she has described rise to the level of "past persecution."  The Act does not define "persecution" and does not specify what sort of acts constitute "persecution."  This court has stated that "a finding of persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty."  *Wiransane*, 366 F.3d at 893 (quotations omitted).  The offensive treatment must be extreme.  *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998).  More than mere harassment is required.  *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000).

"The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment she received rises to the level of persecution."  *Korablina*, 158 F.3d at 1044.  Petitioner describes a number of threats she and her husband received.  Threats alone, however, typically do not

-12-

constitute past persecution. *See Yuk v. Ashcroft*, 355 F.3d 1222, 1234 (10th Cir. 2004). Nor does the ostracism and loss of common grazing privileges petitioner endured necessarily implicate past persecution. While petitioner describes an incident in which her husband's car was pelted with rocks, her husband was not physically harmed and petitioner fails to show that she personally suffered any violence from the Mungiki. Admittedly, petitioner was present during the unsuccessful attack on her house. Even this form of harassment, however, fails to rise so clearly to the level of persecution that we would be justified in overturning the IJ's findings. These incidents taken cumulatively are insufficient to compel a finding of "past persecution" within the meaning of the Act.

### 3. Relocation to avoid future persecution

Even if petitioner has failed to establish past persecution, she can still qualify as a refugee, and hence obtain asylum, by establishing that she has a "well-founded fear of future persecution." 8 C.F.R. § 1208.13(b). The regulations state, however, that an applicant for asylum "does *not* have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . [and] if under all the circumstances it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(2)(ii) (emphasis added). Moreover, if the petitioner has not established past persecution, *and* if the alleged future persecution would not be by

a government or be government-sponsored (which it would not be here), the petitioner bears the burden of establishing that it would be *unreasonable* for her to relocate to escape persecution. *Id.* § 1208.13(b)(3)(i).

There are thus two issues involving relocation to be considered here. First, could petitioner avoid persecution by relocating to Nairobi? Second, would it be unreasonable for her to do so? We note that the regulations specifically place the burden of proof on the second issue on petitioner under the circumstances of this case.

### a. Persecution in Nairobi

As we have already noted, the evidence showed that Kenyans of all tribal backgrounds lived together in relative peace in Nairobi. While there was some evidence of Mungiki activity there, there was not the type of coercion to become circumcised that petitioner recounted in the countryside. Petitioner lived in Nairobi for many years without incident. She admitted that she "[didn't] know what would happen" if she returned to Nairobi. Admin. R. at 108. In sum, the evidence supports the IJ's finding that petitioner could relocate to Nairobi to escape persecution.

-14-

### b. Reasonableness of relocation

The IJ found that petitioner "very easily could have relocated to another area of Kenya." Admin. R. at 51. Agency regulations outline a number of factors that go into the inquiry of whether relocation would be reasonable:

> [A]djudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

8 C.F.R. § 1208.13(b)(3).

Petitioner complains that the IJ failed to consider these factors expressly in concluding that relocation was a reasonable option for her. It was her burden, however, to present affirmative evidence concerning the unreasonableness of relocation. The regulation states that the individual factors identified "may, or may not, be relevant, depending on all the circumstances of the case." *Id.* Petitioner should have presented evidence that would have shown the relevance of the factors she wished to have considered. Petitioner presented insufficient evidence to affirmatively show that her age, gender, health, and social and

-15-

familial ties would make relocation to Nairobi unreasonable. [2] As to civil strife and other harm in Nairobi, petitioner asserts in her brief that the Mungiki are active there, but her evidence on this point is far from compelling with regard to FGM, the threat she cites as her reason for seeking asylum. Petitioner and her husband lived in Nairobi for many years. She has failed to show, particularly given her burden on this issue, that the evidence compels a finding that it would be unreasonable for her to relocate to Nairobi.

The petition for review is DENIED.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

---

[2] The fact that petitioner's daughters already live in the United States, and that one of them was granted asylum on the same facts on which petitioner's application is based, *see* Aplt. Opening Br. at 4, n.1, tends to show that "familial ties" may be affected by relocation. *See Melkonian v. Ashcroft*, 320 F.3d 1061, 1071 (9th Cir. 2003). By itself, however, this is insufficient to show that relocation would be unreasonable.