

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-26-2004

# Smriko v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1085

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Smriko v. Atty Gen USA" (2004). *2004 Decisions.* Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———

NO. 03-1085

———

SEJID SMRIKO
Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL
OF THE UNITED STATES
Respondent

———

On Petition for Review of an Order
of the Board of Immigration Appeals
A71-685-464

———

Argued April 16, 2004
BEFORE:  RENDELL, STAPLETON
and LAY,* Circuit Judges

(Opinion Filed: October 26, 2004)

———

James G. Gavin (Argued)
21 West Broad Street
Burlington, NJ 08016
 Attorney for Petitioner

———

* Hon. Donald P. Lay, United States
Circuit Judge for the Eighth Circuit, sitting
by designation.

Peter D. Keisler
Anthony Wray Norwood
Earle B. Wilson
Michael P. Lindemann
John D. Williams
Terri J. Scadron (Argued)
U.S. Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC  20044

———

OPINION OF THE COURT

———

STAPLETON, Circuit Judge:

Sejid Smriko was a lawful permanent resident of the United States for less than five years when he committed a crime involving moral turpitude that, under 8 U.S.C. § 1227(a)(2)(A)(i), subjects one to deportation.  Smriko was admitted to the United States, however, with "refugee status," pursuant to a section of the Immigration and Nationality Act ("INA") that implements the United Nations Protocol Relating to the Status of Refugees.  Smriko requested that the Immigration Judge ("IJ") terminate his removal proceedings because, he argued, refugee status can only be cancelled pursuant to limited grounds specified in the INA, none of which were met here.  The IJ agreed with Smriko that, if he still had refugee status, he would not be eligible for deportation.  The IJ suggested, however, that when an alien "voluntarily chooses" to "adjust" his status from that of

a refugee to that of a lawful permanent resident, the alien loses refugee status and its accompanying statutory protections. Although the IJ did not provide any supporting precedent, he denied Smriko's motion to terminate removal proceedings based on this reading of the INA. The Board of Immigration Appeals ("BIA" or "Board") thereafter summarily affirmed the IJ's decision without opinion. Smriko now petitions for review of the IJ's decision, as well as the BIA's decision to affirm without opinion a case that he maintains raises novel issues of statutory interpretation.

We first examine the merits of Smriko's challenge, and conclude that his view of refugee status–that it can only be terminated pursuant to specific enumerated grounds contained in the INA–is consistent with the text and some of the legislative history of the INA. We then note the absence of any precedent counseling in favor of or against Smriko's proposed interpretation, and briefly examine the Government's argument that an overall, expert examination of our nation's immigration laws and system would counsel against Smriko's proposed reading of the INA, and, instead, would suggest that the INA "implicitly" contemplates that refugees who achieve lawful permanent resident status simultaneously lose their refugee status.

Recognizing that the BIA has been charged with providing expert interpretations of our nation's immigration laws and that this Court must give the BIA

deference in making such determinations, we then examine Smriko's contention that his case was improperly subjected to the BIA's affirmance without opinion process, thereby erroneously preventing the BIA from offering its interpretation of the statutory provision at issue here. We then conclude that, in most situations, we may, in reviewing a final order of deportation, review the BIA's decision to issue an affirmance without opinion in a particular case. Here, we conclude that the Board member charged with examining Smriko's case clearly acted arbitrarily and capriciously by issuing an affirmance without opinion, in violation of the BIA's streamlining regulations, with respect to a case presenting novel and substantial legal issues without precedent. This agency action deprived us of a Board interpretation of the INA that we believe the applicable agency regulations intended us to have before addressing the merits of Smriko's petition. Accordingly, we will grant the petition for review and remand so that the BIA may exercise its expertise and address Smriko's proposed reading of the INA.

I.

The facts before us are neither complicated, nor in dispute. Smriko is a native and citizen of Bosnia-Herzegovina who was admitted to the United States as a refugee on October 20, 1994 pursuant to 8 U.S.C. § 1157. At some point thereafter, Smriko was granted lawful permanent resident status pursuant to 8 U.S.C. § 1159(a)(2), backdated to his entry date of

October 20, 1994.

Within five years of his entry into the United States, Smriko was convicted on three occasions of retail theft offenses in Pennsylvania and New Jersey. On December 26, 1996, he was convicted of retail theft in violation of 18 Pa. Cons. Stat. § 3929(a)(1), and sentenced to pay a fine and costs. On April 1, 1997, he was convicted of shoplifting in violation of N.J. Stat. Ann. § 2C:20-11b(2), and received a suspended sentence of five days' imprisonment. Finally, on April 8, 1999, he was convicted of retail theft and receiving stolen property, in violation of 18 Pa. Cons. Stat. §§ 3929(a) & 3925(a), respectively, and was assessed costs and sentenced to one year of probation.

The former Immigration and Naturalization Service ("I.N.S.") commenced removal proceedings against Smriko on August 24, 1999, charging him with removability on two statutory grounds: (1) under 8 U.S.C. § 1227(a)(2)(A)(i), as an alien convicted of a crime involving moral turpitude committed within five years after his admission for which a sentence of one year or longer may be imposed; and (2) under 8 U.S.C. § 1227(a)(2)(A)(ii), as an alien convicted of two or more crimes involving moral turpitude not arising out of a single scheme of criminal misconduct. Smriko argued that his convictions were not for crimes involving moral turpitude, but the IJ rejected that challenge. The IJ also rejected Smriko's aforementioned argument with respect to his refugee status, and after the BIA's affirmance without opinion, this petition followed.[1]

## II.

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). *See Mulanga v. Ashcroft*, 349 F.3d 123, 131 (3d Cir. 2003). "[W]hen the BIA issues an [affirmance without opinion] under the streamlining regulations, we review the IJ's opinion and scrutinize its reasoning." *Dia v. Ashcroft*, 353 F.3d 228, 245 (3d Cir.2003) (*en banc*). "We review the [agency's] legal determinations *de novo*, subject to established principles of deference." *Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004) (citing *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 844 (1984)); *see infra* note 6 (discussing the propriety of giving *Chevron* deference to an IJ decision that has been affirmed without opinion by the BIA).

## III.

Title 8, Section 1227(a)(2)(A)(i) of the United States Code, provides, in

---

[1]The Government initially argued that the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(C) applied here, and, accordingly, moved to dismiss the petition for lack of jurisdiction. The Government has since conceded, and we agree, that § 1252(a)(2)(C) is not implicated in this case. Accordingly, we will deny by separate order the motion to dismiss.

3

pertinent part:

> Any alien who–(I) is convicted of a crime involving moral turpitude committed within five years . . . after the date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable.

*Id.* As noted above, Smriko was convicted for receiving stolen property under 18 Pa. Cons. Stat. § 3925(a).[2] That conviction unquestionably met the criteria of § 1227(a)(2)(A)(i). Smriko committed the § 3925(a) violation on December 19, 1998, within five years of his date of admission to the United States. Under Pennsylvania law, given the amount of stolen property involved here, that offense constituted a misdemeanor in the third degree, *see* 18 Pa. Cons. Stat. § 3903(b)(2), which carried a potential prison sentence of one year, *see* 18 Pa. Cons. Stat. § 1104(3).

Smriko argues only that his conviction under § 3925(a) was not for a

---

[2]That section provides: "A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." *Id.* § 3925(a).

crime involving moral turpitude. He argues that shoplifting, the offense for which he was convicted under § 3925(a), is not a "crime involving moral turpitude," essentially because it is a prevalent crime in our modern world, and therefore that his violation of § 3925(a) would not qualify him for deportation under 8 U.S.C. § 1227(a)(2)(A)(i).

We recently explained, in examining § 3925(a), the very Pennsylvania statute at issue here, that "[w]hether an alien's crime is one involving moral turpitude is determined by the statute and record of conviction rather than the alien's specific act." *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 635 (3d Cir. 2002). That is, "the nature of an alien's crime is determined by the statute and record of conviction, not from the specific acts surrounding the conviction." *Id.* (parenthetically quoting *Alleyne v. I.N.S.*, 879 F.2d 1177, 1185 (3d Cir.1989)) (alteration omitted). While we noted that "[t]he term 'moral turpitude' defies a precise definition," we indicated that it contains "an 'honesty' component . . . , which includes: '[c]onduct that is contrary to justice, honesty, or morality.'" *Id.* at 635-36 (quoting *Black's Law Dictionary* 1026 (7th ed. 1999)) (additional citations omitted). After noting that "[c]ourts have held that knowingly receiving stolen property is a crime of moral turpitude," 293 F.3d at 636, and that violation of 18 Pa. Cons. Stat. § 3925(a) "speak[s] . . . to the honesty of a person," *id.* at 637, we determined that a violation of that section amounts to a crime

4

involving moral turpitude, *id.* at 637. *De Leon-Reynoso* clearly controls this case. We accordingly reject Smriko's insistence that his § 3925(a) conviction was not for a "crime involving moral turpitude."[3]

## IV.

Our task is not complete, however, as Smriko suggests that the INA affords him additional protection as one who received "refugee status" upon his entry into the United States. While Smriko concedes that 8 U.S.C. § 1227(a)(2)(A)(i) subjects a lawful permanent resident, such as himself, to deportation, he argues that the INA only allows one with "refugee status" to be removed under limited circumstances. He argues that "refugee status" coexists with lawful permanent resident ("LPR") status, providing additional protection, and that he cannot be removed unless one of the limited grounds under the INA for cancelling refugee status is met.

### A. Smriko's Contention that Refugee Status Coexists with LPR Status

Smriko's contention that refugee status coexists with LPR status and must

---

[3]Having determined that Smriko's § 3925(a) conviction amounted to a deportable offense under 8 U.S.C. § 1227(a)(2)(A)(i), we need not address the Government's charge that Smriko's other convictions amounted to deportable offenses.

be terminated through a specific statutory process before he can be removed begins with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (the "Protocol"). The United States is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 (the "Convention"), *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999), and incorporates the definition of the term "refugee" found in Article I of the Convention. *See* Protocol Art. I(1) & (2).

Under Article I of the Convention, entitled "Definition of the term 'refugee,'" one ceases to be a refugee if any of six events occur. *See* Convention Art. I(C). In the case of a refugee in Smriko's situation, refugee status would not cease until "he has acquired a new nationality, and enjoys the protection of the country of his new nationality." *Id.* I(C)(3). The United Nations High Commissioner for Refugees has taken the position that this provision "means that the refugee must secure and be able to exercise all the rights and benefits entailed by possession of the nationality of the country" before losing refugee status, and because LPR status does not entitle one to the same rights and benefits as a United States national, obtaining LPR status is not a basis for the cessation of refugee status under the Convention. *See Interpreter Releases*, *Becoming LPR Does Not Terminate Refugee Status, UNHCR Says*, 80 No. 11

5

Inter. Rel. 413, App. (2003) (statement from Office of the United Nations High Commissioner for Refugees). Accordingly, Smriko argues that the Convention contemplates him retaining refugee status even after he achieved LPR status because attaining LPR status did not give him a "new nationality" that would terminate the need for refugee status under the Convention.

The Refugee Act of 1980, 94 Stat. 102, brought into existence the current definition of "refugee" in the INA, *see* 8 U.S.C. § 1101(a)(42)(A). The Supreme Court has instructed that "[i]f one thing is clear from the legislative history of the . . . definition of 'refugee,' and indeed the entire 1980 [Refugee] Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). Accordingly, Smriko insists that the definition of "refugee" found in the INA and the accompanying provisions for giving aliens "refugee status," which we address below, are to be construed as implementing the protections for refugees found in the Convention.

Title 8, United States Code Section 1101(a)(42)(A), defines a "refugee" as

> any person who is outside any country of such person's nationality or, in the case of a person having no

nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

*Id.* "Refugee" is used in many sections of the INA. The provision under which Smriko was admitted, 8 U.S.C. § 1157(c)(1), authorizes the Attorney General "in [his or her] discretion and pursuant to such regulations as [he or she] may prescribe" to admit a limited number of "refugees" annually. Refugees admitted under 8 U.S.C. § 1157, such as Smriko, may then become lawful permanent residents after one year pursuant to 8 U.S.C. § 1159(a)–the key statutory provision at issue here. This section, permitting refugees to obtain LPR status, speaks only of refugees who qualify being "*regarded as* lawfully admitted to the United States for permanent residence [after one year]," *id.* § 1159(a)(2) (emphasis added), and does not explicitly provide for the termination of refugee status upon one being "regarded as" a lawful permanent resident. The absence of language terminating refugee status in §

6

1159(a), Smriko contends, is consistent with the definition of refugee found in § 1101(a)(42)(A), which does not indicate any particular time when one ceases to be a refugee. Thus, Smriko argues, contrary to the IJ's suggestion, becoming an LPR under the text of the statute provides only additional benefits for those with refugee status and does not terminate refugee status, consistent with Congress's intent to implement the Protocol, which would require Smriko to maintain refugee status until achieving protection equivalent to that of a United States national.

Other immigration law, Smriko suggests, also contemplates refugee status persisting after lawful permanent resident status is obtained. While, as discussed above, a refugee may be "regarded as" a lawful permanent resident after *one* year, *see* 8 U.S.C. § 1159(a)(1), 8 C.F.R. § 207.7 allows the family members of a "refugee," under some circumstances, to obtain derivative refugee status if they apply within *two* years of the principal refugee's admission, thereby utilizing the principle alien's refugee status even after he or she received LPR status.

Moreover, Congress and the Department of Homeland Security (through its implementing regulations) have explicitly provided for a means of removing refugee status, consistent with the Protocol and apart from the IJ's suggestion that refugee status is "implicitly" forfeited upon becoming an LPR. Under 8 U.S.C. § 1157(c)(4), the Attorney General may terminate "[t]he

refugee status of any alien . . . pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee . . . at the time of the alien's admission." *Id.* The implementing regulations for that section further require that the refugee be given "notice in writing" of the Government's intent to "terminate the alien's refugee status," along with 30 days in which to prepare evidence to be presented at a hearing to show cause "why the alien's refugee status should not be terminated." 8 C.F.R. § 207.9. Furthermore, the regulations indicate that "[u]pon termination of refugee status[] the district director shall process the alien under [the INA's provisions for removal]." *Id.* Thus, Smriko argues, if the Government wishes to seek his removal under the INA, the statute and its implementing regulations provide an explicit process for first removing his refugee status–a procedure not followed here–and then processing him for removal. Had Congress sought to remove refugee status for aliens who become lawful permanent residents under § 1159(a)(1), it could have explicitly provided for removing that status as it did in § 1157(c)(4).[4]

---

[4]Smriko also urges that his interpretation is supported by the BIA's decision in *Matter of Medrano*, 20 I. & N. Dec. 216 (BIA 1990). There, an alien had been granted lawful temporary resident status through the amnesty provisions of the Immigration Reform and Control Act

Smriko concedes that his proposed construction of the INA would offer those with refugee status more protection than other lawful permanent residents, but argues that this was Congress's intent in implementing the Protocol (and Convention). He agrees that under the Convention, "[e]very refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations," Convention, Art. II, but notes that the violation of any criminal law is not, in and of itself, grounds for terminating refugee status under that agreement. While he is liable for violating criminal laws in the same manner as a United States citizen would be, he argues that Congress, in implementing the Protocol, intentionally limited the grounds for cancelling refugee status because it intended to give refugees heightened protection (as compared to other aliens) in light of the traumatic conditions they have fled. Because he views § 1159(a)(2), allowing for those with refugee status to become "regarded as" lawful permanent residents, as not terminating his refugee status, he suggests that the Government could only have cancelled his refugee status under § 1157(c)(4). In light of the Government not even having attempted to cancel his refugee status under § 1157(c)(4) or having followed the procedure outlined under 8 C.F.R. § 207.9 for doing so, Smriko argues that he has been improperly subjected to removal proceedings.

## B. The Government's Response

The Government concedes that "[t]he statutory definition of 'refugee' [in 8 U.S.C. § 1101(a)(42)(A)] speaks in the present tense [and] imposes no temporal limitation on refugee status." Respondent's Brief at 15. Moreover, the

---

of 1986, *see* 8 U.S.C. § 1255a, and then was convicted of a crime that would ordinarily subject an alien to deportation. At the time of the BIA's decision in *Medrano*, the implementing regulations providing for cancellation of temporary resident status under § 1255a, not unlike 8 C.F.R. § 207.9 and its requirements for removing refugee status, allowed for cancellation where the Government provided notice of its intent to remove and an opportunity to offer evidence in opposition, 8 C.F.R. § 245a.2(u)(2). An IJ determined that the Government would have to terminate Medrano's temporary resident status through § 245a.2(u)(2) prior to initiating deportation proceedings based upon his having committed a crime that would ordinarily otherwise subject an alien to deportation, and the BIA affirmed. Citing *Medrano*, Smriko argues that the procedures set forth at 8 C.F.R. § 207.9 for removing refugee status must also be met here before removal proceedings can be initiated against him. *Medrano*, however, is not particularly helpful here, as in front of the BIA the Government there "removed its opposition to the decision of the immigration judge," *Medrano*, 20 I. & N. Dec. at 218, and the BIA accordingly saw "no reason to disturb the immigration judge's decision." *Id.* at 218-19.

Government does not appear to dispute that nothing in the INA expressly terminates refugee status once a refugee achieves LPR status pursuant to 8 U.S.C. § 1159(a)(2). Instead, the government argues that

> [i]n practice, however, all sources of domestic law, including the INA and its supporting regulations, administrative and judicial case law, and the practices of the INS, the Department of Homeland Security, and the Executive Office for Immigration Review, *reason* that when a "refugee" adjusts to "lawful permanent resident" . . . status, he no longer is considered to be in "refugee" status for purposes of United States immigration and nationality law. Rather, he either maintains his LPR status and may subsequently naturalize to U.S. citizenship, or possibly, may lose his LPR status and become a deportable alien under [8 U.S.C. § 1227].

Respondent's Brief at 15-16 (emphasis added). The Government then presents legislative history, INA provisions, implementing regulations, and two BIA decisions that, it suggests, implicitly contemplate the termination of refugee status once an alien receives lawful permanent resident status pursuant to § 1159(a)(2).

First, the government looks to the conference report from the Refugee Act of 1980. The conference report indicates that the Senate's bill originally provided that, absent emergency situations, refugees would be admitted as lawful permanent residents (with there simply being no such thing as refugee status), while an amendment in the House provided for "all refugees entering the United States [to] be admitted conditionally as 'refugees' with retroactive adjustment of status to lawful permanent residents after two years." H.R. Conf. Rep. No. 96-781, at 21 (1980), *reprinted in* 1980 U.S.C.C.A.N. 160, 162. The Committee of Conference adopted the House Amendment, but "with adjustment of status permitted after a period of one year." *Id.* The Government also looks to a statement by Senator Edward Kennedy, the Senate bill's chief sponsor, who indicated that

> the Conferees compromised on the House version and established a new 'refugee' admission status–different from either the present 'conditional entry' or 'parolee' status. This new status will end after only one year–rather than two years–after which the refugee can adjust to permanent resident status. This one year 'refugee' status would also be counted

9

towards the five-year period required for naturalization.

126 Cong. Rec. S3756-57 (daily ed. Feb. 26, 1980). Thus, the Government argues that "refugee status" was intended to be a conditional status, and was intended to end after one year.

The Government further notes that 8 U.S.C. § 1159(a) calls for, at the end of one year, a refugee who has not yet "acquired" lawful permanent resident status to be "returned to the custody of the Service for inspection and examination," *id.* § 1159(a), and processed "in accordance with" the removal provisions of the INA unless the alien is adjudged "admissible" at that time and can therefore be "regarded as lawfully admitted," *id.* § 1159(a)(2). Because § 1159(a) does not reference any special procedure for terminating refugee status before removing one *not admissible* at the end of the one year period, the Government argues that this provision supports the view that refugee status is conditional and disappears for one who *is admissible* and does obtain LPR status.[5]

Finally, the Government looks to two BIA decisions, neither of which addresses Smriko's argument that the INA's protections for refugees, as drafted by Congress *in implementing the Protocol*, co-exist with lawful permanent resident status and must be terminated prior to the initiation of removal proceedings. One decision briefly suggests, without analysis, that once a refugee adjusts to LPR status, the "former" status as a refugee does "not provide a basis for terminating [removal] proceedings." *In re Bahta*, 22 I. & N. Dec. 1381, n.2 (BIA 2000). The other suggests that one in Smriko's position–*i.e.*, one who has not had his refugee status terminated (based on a determination that he was not a refugee at the time of his admission) under INA § 207, 8 U.S.C. § 1157, and who has not been determined to be inadmissible following his examination by an immigration officer under INA § 209(a)(1), 8 U.S.C. § 1159(a)(1),–is not properly placed in exclusion proceedings. *Matter of Garcia*, 19 I. & N. Dec. 407 (BIA 1986). Neither decision addresses what the government terms to be Smriko's "novel," Respondent's Brief at 9, argument–that the INA's provisions pertaining to "refugee status," read in light

---

[5]The Government also suggests that no provision of the INA "confer[s] any authority on an immigration judge to engage in the sort of termination process proposed by Smriko before adjudicating a lawful permanent resident's removability from the United States." Respondent's Brief at 17-18 (citing 8 U.S.C. § 1227(a) (setting forth the classes of "deportable

aliens")). Contrary to the Government's suggestion, however, Smriko only argues that an IJ cannot conduct removal proceedings until his refugee status has been terminated in accordance with the process set forth at 8 C.F.R. § 207.9, and does not argue that IJ's must engage in any special "termination process."

of Congress's intent to implement the Protocol, provide extremely limited grounds for terminating his refugee status, none of which was met here.

## C. Discussion

"The first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 222 (3d Cir. 2004) (internal quotation marks omitted). At issue here is whether Smriko, in becoming "*regarded as* lawfully admitted to the United States for permanent residence," 8 U.S.C. § 1159(a)(2), lost his refugee status. As we have indicated, § 1159(a)(2) does not unambiguously describe what happens to an alien's refugee status once he or she becomes "regarded as" a lawful permanent resident. Of course, "if the intent of Congress is clear . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Coraggioso v. Ashcroft*, 355 F.3d 730, 733 (3d Cir. 2004) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)) (internal quotation marks omitted). We are left here, however, with Congressional intent that is, at least to some degree, in conflict: the goal of implementing the Protocol versus, potentially, the desire to create a "conditional" status for a single year. In such situations, where there is conflicting legislative history and "the statute is silent or ambiguous with respect to the specific issue," our role is to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* (internal quotation marks omitted).

Although the INA is ambiguous with respect to Smriko's challenge and Smriko has marshaled at least some legislative history in support of his proposed construction, we are without, in this case, an "agency answer" to examine and potentially defer to. The BIA answered Smriko's "novel" challenge by assigning his case to a single member who affirmed without opinion the decision of the IJ, whose decision therefore became the final agency determination pursuant to the agency's affirmance without opinion regulations, *see* 8 C.F.R. § 1003.1(e)(4)(ii). Pursuant to those regulations, "[s]uch an order approves the result reached in the decision below[, but] does not necessarily imply approval of all of the reasoning of that decision," *id.*

In its entirety, the IJ's response to Smriko's proposed statutory construction consisted of the following:

> [W]hile the motion for termination would have been granted had the respondent remained a refugee, the respondent unfortunately in this case had adjusted his status to that of a lawful permanent resident, pursuant to Section 209 of the [INA, 8 U.S.C. § 1159]. The respondent

11

voluntarily chose to adjust his status and certainly there are benefits and rewards in acquiring the status of a lawful permanent resident and respondent has not provided any precedent decisions or any other legal basis for the proposition that a lawful permanent resident also retains the status of a refugee, pursuant to Section 207 [of the INA, 8 U.S.C. § 1157].

IJ's Op. at 2. Even assuming *arguendo* that an IJ's decision affirmed without opinion pursuant to the streamlining regulations would otherwise be entitled to *Chevron* deference,[6] we recently explained

that where an "IJ offer[s] no reasoning and cite[s] no authority . . . we have no basis on which to conclude that the IJ's reading and application of [a statute is] 'reasonable' and therefore entitled to deference under *Chevron*[]." *Berishaj v. Ashcroft*, 378 F.3d 314, 327 (3d Cir. 2004). As in *Berishaj*, the IJ here offered no analysis of the relevant statutory provisions or authority to which we may defer. Thus, we are left to review an IJ's

be the case.

Where, as here, the BIA has affirmed without opinion the decision of the IJ, under 8 C.F.R. § 1003.1(e)(4)(ii), its affirmance "approves the result reached in the decision below[, but] does not necessarily imply approval of all of the reasoning of that decision," *id.* As *Aguirre-Aguirre* determined that the *BIA*'s case-by-case decision-making should be accorded *Chevron* deference, it would seem to be, at the very least, an open question as to whether an IJ's decision affirmed through the streamlining process would be entitled to *Chevron* deference. Although the BIA has directed us to review the IJ's opinion in streamlined cases, deferring to the reasoning of an IJ from which the BIA would be free to depart in other cases would seem highly problematic. We need not resolve this issue here, however, because the IJ, as explained above, offered no analysis or precedent to which we could defer. We ultimately decide to remand to the BIA rather than the IJ because that course is required by the regulations.

---

[6]The Supreme Court has determined that "the *BIA* should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *Aguirre-Aguirre*, 526 U.S. at 425 (emphasis added; internal quotation marks omitted). Citing *Aguirre-Aguirre*, we recently stated in a dictum that "the BIA's *(and hence the IJ's)* interpretation of the INA is subject to established principles of deference." *Coraggioso*, 355 F.3d at 733 (emphasis added). *Aguirre-Aguirre*, however, did not determine that the opinion of an IJ, when affirmed without opinion by the BIA's streamlining process, is entitled to *Chevron* deference, and it does not necessary follow that such would

12

opinion that does not analyze the statutory interpretation issue at hand, with a single BIA member having issued an affirmance without opinion that precluded the BIA from providing its interpretation of the statutory provision at issue, purportedly pursuant to the agency's "streamlining regulations," which we will describe in detail below.

Smriko raises an additional challenge, however, to the process by which his case arrived at the Court of Appeals without having such an agency answer. While he recognizes that the BIA acted within its authority to promulgate the streamlining regulations and did not, *per se*, violate his Due Process rights by doing so, *see Dia*, 353 F.3d at 236-43, he argues that the BIA erred in its *application* of the streamlining regulations to his case. *See Berishaj*, 378 F.3d at 331 ("Though the *en banc* Court in *Dia* approved the streamlining regulations over a statutory and Constitutional challenge, it does not follow that the regulations are not subject to misuse and even abuse."). He suggests that we may review the single Board member's application of the streamlining regulations, and that the Board member erred here because, under those regulations, his case could not have possibly qualified for streamlining.

V.

As we recently explained in *Dia*, "[t]he Attorney General promulgated the streamlining regulations in 1999 when the Board was faced with a crushing caseload,

the number of cases having increased exponentially in a little over a decade." *Dia*, 353 F.3d at 235. The portion of those regulations describing the affirmance without opinion process employed here provides that:

> (i) The Board member to whom a case is assigned shall affirm the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

>> (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or

>> (B) The factual and legal issues

13

raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

(ii) If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. See 8 CFR 1003.1(e)(4)." An order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the immigration judge or the Service were harmless or nonmaterial.

8 C.F.R. § 1003.1(e)(4). Smriko argues that, under any standard of review, the single BIA member assigned to his case erred in subjecting it to the affirmance without opinion process described above because the IJ's decision was not correct, *id.* § 1003.1(e)(4)(i), her errors were not harmless, *id.*, his case was not "squarely controlled" by existing Board or federal court precedent, *id.* § 1003.1(e)(4)(i)(A), and his case did not raise issues so insubstantial that a written opinion would be unwarranted, *id.* § 1003.1(e)(4)(i)(B).

The Government counters that application of the above standards entails a "complicated balancing of a number of factors" only comprehensible to the single Board member, and contends that it is simply "not possible to devise an adequate standard of review" for determining whether there is precedent that "squarely controls" the present case and whether the issues raised are "not so substantial," especially so because the regulations require the single Board member issuing a streamlining order to provide no reasoning, *see id.* § 1003.1(e)(4)(ii). We first address the Administrative Procedure Act's ("APA") "basic presumption of judicial review. . . ." *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993); *see Calle-Vujiles v. Ashcroft*, 320 F.3d 472, 474 (3d Cir. 2003) ("there is a strong presumption that Congress intends judicial review of administrative action"). We then turn to the limited category of administrative decisions committed to agency discretion, and determine whether a single Board member's application of the streamlining regulations is such a decision.

14

## A. The Availability of Judicial Review

Under the APA, any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 702. Decisions of the BIA are agency actions within the meaning of the APA. 5 U.S.C. § 701(b)(1). The only exceptions to this general rule are situations in which "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Where the governing statute provides for "special statutory review," as does § 242 of the INA, 8 U.S.C. § 1252, that is the form that the required judicial review will take. 5 U.S.C. § 703. Under the INA, in reviewing a final order of removal pursuant to 8 U.S.C. § 1252, the Court of Appeals may "review . . . *all questions of law and fact*, including interpretation and application of constitutional and statutory provisions, *arising from any action taken* or proceeding brought to remove an alien from the United States. . . ." *Id.* § 1252(b)(9) (emphasis added). Similarly, Section 704 of the APA provides: "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Thus, our review of a final agency action, generally speaking, encompasses all of a petitioner's contentions of legal error by the agency at any stage of the agency's proceedings.

Smriko contends that the single Board member charged with applying the streamlining regulations clearly failed to follow those regulations by subjecting his case to the affirmance without opinion process without the regulatory criteria for doing so having been met. He insists that this erroneous application of the regulations is judicially reviewable under the APA as interpreted by the Supreme Court in *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26 (1996). The Court there held in the context of a review of BIA action:

> Though the agency's discretion is unfettered at the outset, if it announces and follows–by rule or by settled course of adjudication–a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as "arbitrary, capricious, [or] an abuse of discretion" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

*Yueh-Shaio Yang*, 519 U.S. at 32.

Based on *Yueh-Shaio Yang* and the APA, it seems clear that we have jurisdiction to review the here challenged application of the streamlining regulations

so long as the INA does not preclude that judicial review and the issues so presented are not committed to agency discretion.[7]

Given that the INA clearly does not preclude review, we now turn to whether the relevant issues are committed to agency discretion by law.

## B. Actions Committed to an Agency's Discretion

Section "701(a)(2) [of the APA] makes it clear that 'review is not to be had' in those rare circumstances where the relevant [law] 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln*, 508 U.S. at 190-91 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). The Government insists that the situation before us is one of those "rare circumstances," likening an individual Board member's decision on whether to direct that a written merits decision on an alien's appeal be issued to the role of an agency accorded absolute discretion in determining whether to institute enforcement proceedings, *see Heckler*, 470 U.S. at 831 ("an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"). *Heckler* involved the Food and Drug Administration's ("FDA") decision to refrain from instituting enforcement proceedings with respect to drugs used in administering lethal injections. The Supreme Court determined that there was "no law to apply" in the Federal Food,

[7]In *Marcello v. Bonds*, 349 U.S. 302, 309-10 (1955), the Supreme Court determined that the hearing provisions of the APA do not apply to agency hearings conducted pursuant to the INA. *See Ardestani v. I.N.S.*, 502 U.S. 129, 133-34 (1991) ("[In *Marcello*, we] held that the INA expressly supersedes the hearing provisions of the APA in light of the background of the 1952 immigration legislation, its laborious adaptation of the [APA] to the deportation process, the specific points at which deviations from the [APA] were made, the recognition in the legislative history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings.") (internal quotation marks omitted). As the government tacitly acknowledges, however, "[a]lthough the detailed hearing procedures specified by the APA do not apply to hearings under the [INA], *see Marcello*[], the judicial review provisions do, *see Shaughnessy v. Pedreiro*, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955)." *I.N.S. v. Doherty*, 502 U.S. 314, 330 (1992) (Scalia, J., concurring and dissenting). As *Yueh-Shaio Yang* holds, the judicial review provisions of the APA, 5 U.S.C. § 706(2)(A), apply to decisions of the BIA on issues not committed to agency discretion. *Yueh-Shaio Yang*, 519 U.S. at

32.

Drug, and Cosmetic Act against which a court could review the FDA's decision not to bring enforcement proceedings. *Id.* at 830-31.

Under the streamlining regulations, in contrast, in order to affirm without an opinion, several specific criteria must be met: (1) the "result reached in the decision under review [must be] correct;" (2) any "errors in the decision under review [must be] harmless or nonmaterial; *and* (3) "(A) [t]he issues on appeal [must be] squarely controlled by existing Board or federal court precedent and . . . not involve the application of precedent to a novel factual situation" or "(B) [t]he factual and legal issues raised on appeal [must be] not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 1003.1(e)(4)(i). All three of these criteria must be met in order for a case properly to be streamlined.[8]

---

[8]*Heckler* also noted that at issue there was the reviewability of an agency's *refusal* to exercise its powers, as opposed to where, as here, an agency has *exercised* its coercive power over an individual. *See Heckler*, 470 U.S. at 832 ("[W]e note that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in

These criteria are clearly intended to require the single BIA member to determine whether the correct outcome was reached and, if so, whether a Board opinion would have significant value in the context of an appeal of the matter or in the context of other matters yet to be adjudicated. We agree with the Tenth Circuit Court of Appeals that "they have nothing to do with the BIA's caseload or other internal circumstances." *Batalova v. Ashcroft*, 355 F.3d 1246, 1253 (10th Cir. 2004); *see also Denko v. I.N.S.*, 351 F.3d 717, 732 (6th Cir. 2003) ("the size of the BIA's caseload–a factor which the Board may be better equipped to assess–has no relevance in deciding which cases are appropriate for summary affirmance"). Rather, these criteria present "the kinds of issues [courts] routinely consider in reviewing cases," *Batalova*, 355 F.3d at 1253, and provide amply sufficient "law" for courts to apply. The fact that they may require the exercise of some discretion on the part of the single BIA member that may be deserving of some deference is, of course, not relevant; the APA expressly authorizes review of the exercise of discretion for abuse.

The government's insistence that § 1003.1(e)(4)(i) requires a single BIA member to assess the availability of agency resources is based upon subsection B and its reference to whether the "issues raised upon appeal are not so substantial that the case warrants the issuance of a

---

some manner.") (emphasis in original).

written opinion," *id.* § 1003.1(e)(4)(i)(B). However, this language focuses upon the lack of importance of the issues, not backlog and the availability of resources to produce an opinion. Moreover, the government's argument ignores the fact that § 1003.1(e)(4)(i) is only one part of an overall case management system that is based solely on the correctness of the result and the institutional value that an opinion would have. Under subsection 1003.1(e), a single BIA member who is assigned a case "shall" do one of three things. If the result is correct and the institutional value of an opinion would be so low that the criteria of (e)(4) are met, he *must* affirm without opinion. On the other hand, if the case presents one of the circumstances enumerated in § 1003.1(e)(6), all relating to the institutional value of an opinion,[9] the case

will be assigned to a three member panel for disposition. If the case is more significant than an (e)(4) case and less significant than an (e)(6) case, the single BIA member will decide the merits of the appeal by himself and issue "a brief order, affirming, modifying or remanding" under § 1003.1(e)(5). In short, the regulations do not call upon single BIA members to evaluate the resources available at a particular time. Rather, the regulations themselves allocate whatever decision-making resources the agency has, calling upon single BIA members to follow the criteria contained in the regulations for allocating those resources.

Nor are we impressed with the government's suggestion that §

---

[9]Subsection (e)(6) provides:
Panel Decisions. Cases may only be assigned for review by a three-member panel if the case presents one of these circumstances:
(i) The need to settle inconsistencies among the rulings of different immigration judges;
(ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;
(iii) The need to review a decision by an

immigration judge or the Service that is not in conformity with the law or with applicable precedents;
(iv) The need to resolve a case or controversy of major national import;
(v) The need to review a clearly erroneous factual determination by an immigration judge; or
(vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).
8 C.F.R. § 1003.1(e)(6).

18

1003.1(e)(4)(ii) precludes a single BIA member from explaining his or her decision to streamline and that this somehow deprives a reviewing court of law to apply. First, reading this section in context, we understand it to preclude any explanation of the member's reason for affirming the IJ's decision so that the IJ's decision will stand alone as the final agency decision. We do not read it as precluding comment regarding the decision to streamline, and there may be rare situations in which the member might find it helpful to file brief comments on this subject. More importantly, however, the law to be applied is provided by the criteria of the regulations, and it will be the rare case, indeed, where the reviewing court, having received the administrative record and the briefs of the parties, will have any difficulty, without more, reaching a decision as to whether the member was so wide of the mark in applying those criteria that his action can be characterized as arbitrary and capricious.

We hold that the issues addressed by single BIA members under § 1003.1(e)(4)(i) of the streamlining regulations are not committed to agency discretion and that the resolutions of those issues are judicially reviewable.

C. The Approach of Other Courts

All but one of the other Circuit Courts that have addressed the issue have agreed or suggested that the affirmance without opinion regulations contain sufficient "law" to provide a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.[10]

---

[10] *See Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003) ("the Board's own regulation provides more than enough 'law' by which a court could review the Board's decision to streamline"); *Denko,* 351 F.3d 717 at 731 ("this argument for committing this decision [to streamline] to the agency's discretion is doubtful because there are judicially manageable standards available to a reviewing court"); *Chen v. Ashcroft*, 378 F.3d 1081, 1086-87 (9th Cir. 2004) (reviewing "whether either subsection" of the streamlining regulations applied to alien's administrative appeal, and remanding because "neither subsection (A) nor subsection (B) of the streamlining regulation permit[ted] summary affirmance" where alien raised "a novel legal and factual issue"); *Batalova*, 355 F.3d at 1252-53 (10th Cir. 2004) (criteria in streamlining regulations address "the kinds of issues we routinely consider in reviewing cases, and they have nothing to do with the BIA's caseload or other internal circumstances"). *But see Ngure v. Ashcroft*, 367 F.3d 975, 987 (8th Cir. 2004) (concluding that "[l]ike other decisions committed to agency discretion by law, the BIA's streamlining determination involves a complicated balancing of a number of factors which are peculiarly within its expertise, including the size of the BIA's caseload and the limited resources available to the BIA") (internal quotation marks and citations

The Eighth Circuit in *Ngure* parted company from the majority approach largely based upon its interpretation of the "not substantial" third factor found in the affirmance without opinion regulations. *Ngure* determined that "[w]hether a particular case 'warrants the issuance of a written opinion' is necessarily a function of the BIA's limited resources at a particular point in time, and the views of members of the BIA as to whether those limited resources should be dedicated to writing an opinion in a given case." *Ngure*, 367 F.3d at 986. As we have indicated, we respectfully disagree with this view.

*Ngure* also gave considerable weight to the legal proposition that an "an agency *pronouncement* is transformed into a binding norm *if so intended by the agency*, and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Ngure*, 367 F.3d at 982 (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)) (internal quotation marks, citations, and alterations omitted; emphasis added). That is, *Ngure* suggested that whether an agency intended for its own compliance with its regulation to be judicially reviewable is relevant to whether an agency's action in applying that regulation is committed to agency discretion under the APA.

_____

omitted).

In support of this view, *Ngure* quoted from the D.C. Circuit's decision in *Padula*. There, faced with a pronouncement from the Director of the Federal Bureau of Investigation ("FBI") regarding the FBI's hiring policy with respect to homosexuals and other letters written by FBI personnel to law schools regarding that policy, the D.C. Circuit set forth the above maxim that these types of "agency statements" would only be "transformed into a binding norm if so intended by the agency." *Padula*, 822 F.2d at 100. While *Padula* understandably looked to agency intent only to determine whether an informal *statement* by an agency constituted a "binding norm" such that departure from that statement could amount to arbitrary and capricious action, *Ngure* extended its use of agency intent to also look at whether an agency intended for a formal *regulation* to be binding upon its officers. This use of agency "intent" in promulgating regulations would seem to turn on its head the "basic presumption of judicial review" embodied in the APA, *Lincoln*, 508 U.S. at 190, the maxim that agency regulations "have the force of law," *Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988), and the requirement that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen," *Service v. Dulles*, 354 U.S. 363, 372 (1957). *See Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959) (applying *Dulles*); *see also Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988) ("[an] Agency's failure to follow its own regulations can be challenged under the APA"). If we routinely begin to look to an

20

agency's intent (with respect to whether its own compliance with its regulations should be subject to judicial review) in promulgating regulations, as *Ngure* would have us do, we may well find that agencies *never* desire judicial review, and would rather be left unchecked in the exercise of their powers.

Contrary to *Ngure*'s suggestion, we do not read *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532 (1970), as abandoning the Supreme Court's long-standing requirement–evidenced in *Dulles*, *Vitarelli*, and *Webster*–that an agency comply with its own regulations. We note, however, that even assuming *arguendo* that courts should look to an agency's "intent" to allow for judicial review in promulgating a regulation, it is doubtful that the agency here sought to preclude a Board member's application of the streamlining regulations from judicial review. A careful review of the streamlining regulations indicates that they specifically contemplate Board members being governed by the agency's regulations. *See* 8 C.F.R. § 1003.1(d)(1)(i) ("The Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures. . . ."). The regulations then indicate that with respect to, for example, one aspect of the case management system involving the time limits within which a Board member is expected to adjudicate an administrative appeal, "[t]he provisions [of the regulations] establishing time limits for the adjudication of appeals reflect an internal management directive in favor of

timely dispositions, but do not affect the validity of any decision issued by the Board and *do not, and shall not be interpreted to, create any substantive or procedural rights enforceable* before any immigration judge or the Board, or *in any court of law or equity*." 8 C.F.R. § 1003.1(e)(8)(vi) (emphasis added). Thus, the regulations specifically contemplate that the Board's compliance with provisions establishing time limits for the adjudication of appeals will not be subject to judicial review. No similar statement is made with respect to an individual Board member's application of the affirmance without opinion regulations under 8 C.F.R. § 1003.1(e)(4), thus undermining the notion that the agency did not "intend" for judicial review of the affirmance without opinion procedure.

## D. Review of the Decision To Affirm Without Opinion

Having concluded that the decision to streamline is judicially reviewable, the correct disposition of the merits of the petition to review is clear. The issue Smriko presents is not "squarely controlled by existing Board or federal court precedent." Nor, we conclude, can that issue be disregarded as legally insubstantial. As the Government acknowledges, "Smirko's [proposed statutory constructions], if accepted as a correct interpretation of the statutory scheme, could upset final removal orders that have been entered against thousands of criminal aliens . . . ," as well as affect the outcome of thousands of proceedings

yet to come. Given this fact, together with the fact that Smriko's argument is both plausible and not directly contradicted by statutory text, regulations, or relevant precedent, we have no choice but to conclude that this decision to streamline was arbitrary and capricious.

## VI.

In many situations where a petition for review challenges a streamlining decision, that decision will have no material impact on a court's exercise of its judicial review function. In most, it will be readily apparent that the decision is not arbitrary or capricious. In many, the reviewing court may simply choose to address the merits of the IJ's decision without resolving the procedural challenge.[11] Nevertheless, we believe the decision we here make on reviewability is

---

[11]The Seventh Circuit Court of Appeals has suggested, correctly it would seem, that, with respect to many cases that are improperly streamlined, "it makes no practical difference whether the BIA properly or improperly streamlined review." *Georgis v. Ashcroft*, 328 F.3d 962, 967 & n.4 (7th Cir. 2003); *see also Denko*, 351 F.3d 717, 732 (6th Cir. 2003) (agreeing with the Seventh Circuit that "for many streamlined cases" it makes "no practical difference" whether the BIA improperly streamlined review). If the IJ's decision is incorrect, the Court of Appeals can simply reach the merits of that decision and reverse.

of substantial importance. It is foreseeable that there will be a number of situations like the one before us in which an arbitrary and capricious decision to streamline will hold the potential for distorting the judicial review that both the regulations and Congress contemplated. When that is the case, a remand for further BIA proceedings is appropriate.

In *Haoud*, for example, the First Circuit granted a petition for review because the affirmance without opinion process had been used "to deny [the Court's] legitimate review power [because the Court was] left without a proper basis to . . . evaluate the Board's own critical analysis," *Haoud*, 350 F.3d at 205. Haoud had presented to the Board a recent BIA case that was seemingly indistinguishable from his own wherein the IJ had reached a contrary result, yet the Board affirmed the IJ's determination in his case without opinion. The First Circuit remanded because the affirmance without opinion prevented the BIA from "fully explain[ing why it] reasonably depart[ed] from its own precedent," *id.* at 207, in violation of the settled maxim that "[a]dministrative agencies must apply the same basic rules to all similarly situated supplicants," *id.* at 207 (citation omitted).

Similarly, the Fifth Circuit recently remanded a streamlined case to the BIA where the IJ had suggested multiple grounds for denying relief, one of which, if selected as the reason for affirmance by the BIA, would have denied an alien's asylum application as untimely and would

have prevented the Court of Appeals from exercising jurisdiction. *Zhu v. Ashcroft*, ___ F.3d ___, ___, 2004 WL 1854553, *5-*6 (5th Cir. Aug. 19, 2004). The Court determined that the BIA's use of the affirmance without opinion procedure under such circumstances created a "jurisdictional conundrum" in that it prevented the Court from "knowing whether the BIA affirmed the IJ's decision on a non-reviewable basis, *e.g.*, untimeliness, or a reviewable basis, *e.g.*, the merits of Zhu's asylum claim." *Id.* The Court remanded so that the BIA could indicate whether relief was denied based upon untimeliness (which would destroy the court's jurisdiction under an applicable statute) or on the merits of the asylum application (which would allow the court to exercise jurisdiction and reach the merits of the alien's claim).

Where, as here, an important portion of the statutory scheme can be read to produce materially different results, proper application of the streamlining regulations is essential. We are *required* to "accord[] *Chevron* deference [to the BIA] as it gives ambiguous statutory terms 'concrete meaning through a process of c a s e - b y - c a s e   a d j u d i c a t i o n . ' " *Aguirre-Aguirre*, 526 U.S. at 425 (quoting *Cardoza-Fonseca*, 480 U.S. at 448-49). If, as happened here, an individual Board member arbitrarily and capriciously streamlines a case where no Board or binding precedent accepts or rejects an alien's plausible interpretation of an ambiguous statute, we are then left to interpret the statute without the BIA

having provided its *Chevron* deference-entitled "concrete meaning" to an ambiguous statute.[12] The present case demonstrates that arbitrary and capricious application of the streamlining regulations can result in building case law that is fashioned without the benefit of agency expertise.

Here, Smriko presented a plausible reading of the INA to the Board, raising a substantial and important issue of refugee law. Despite the absence of precedent "squarely controlling" Smriko's argument, Smriko's case was erroneously affirmed without opinion. That error then prevented the Board from offering its expert opinion on the novel statutory construction issue now before us. Rather than usurping the role of the BIA and establishing a precedent that the Board's expertise might counsel against, we now grant the petition for review in light of the streamlining error. The Board's decision will be vacated, and, given the "need to establish

---

[12]One might argue, we suppose, that the individual Board member's decision to issue an affirmance without opinion was an "implicit" rejection of Smriko's proposed statutory construction in favor of another construction. However, the Board member's decision to issue an affirmance without opinion, in and of itself, is not a substitute for the kind of analysis of the relevant statutes, regulations, or legislative history, that would be required in order to afford *Chevron* deference. *See Berishaj*, 378 F.3d at 327.

a precedent construing the meaning of," 8 C.F.R. § 1003.1(e)(6)(ii), the INA in this context, we will remand the matter for further proceedings before a three member panel of the Board.

SMRIKO V. ASHCROFT - NO. 03-1085

LAY, Circuit Judge, concurring.

I fully concur in Judge Stapleton's well-reasoned opinion. I write separately to point out that I have participated in two Eighth Circuit cases, i.e., *Wolde v. Ashcroft*, 2004 WL 1759141 (8th Cir. 2004) (non-published), and *Loulou v. Ashcroft*, 354 F.3d 706 (8th Cir. 2003), which follow the Eighth Circuit's opinion of *Ngure v. Ashcroft*, 367 F.3d 975 (8th Cir. 2004). In *Ngure*, the Eighth Circuit has stated that the Board of Immigration Appeals' decision to issue an affirmance without opinion was not subject to judicial review. I believe that the analysis by Judge Stapleton in the instant case is the correct analysis and I write solely to explain my reason for joining his opinion rather than adhering to the opinion in *Ngure*.